# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 01-3556

_____

United States of America,

        Appellee,

v.

Steven B. Pherigo,

        Appellant.

_____

No. 01-3885

_____

Appeals from the United States
District Court for the
Eastern District of Missouri.

United States of America,

        Appellee,

v.

William Piercefield,

        Appellant.

_____

No. 01-3887
_____

| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| William F. Gilyard, | * |
| | * |
| Appellant. | * |

_____

Submitted: November 6, 2002

Filed: May 5, 2003
_____

Before HANSEN,[1] Chief Judge, BEAM and SMITH, Circuit Judges.
_____

SMITH, Circuit Judge.

William Gilyard, William Piercefield, and Steven Pherigo were indicted for possession with the intent to distribute over five grams of cocaine base, a violation of 21 U.S.C. § 841(a)(1). Pherigo entered a guilty plea and was sentenced to 120 months' imprisonment. A jury found both Gilyard and Piercefield guilty of the charge. Gilyard was sentenced to 276 months' imprisonment, and Piercefield received

_____

[1] The Honorable David R. Hansen stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

a ninety-seven-month sentence. All three defendants appeal, urging a variety of grounds for reversal. Gilyard and Piercefield seek new trials. Piercefield, along with Pherigo, also seeks resentencing. We believe their arguments are without merit and affirm the district court.[2]

## I.
## Background

The events that gave rise to this case began in January of 2001, when the Maryland Heights Police Department arrested Charles Owen while he was smoking crack in his automobile. He informed the officers that he had purchased the crack two hours earlier from Pherigo. According to Owen, Pherigo acquired the crack from Gilyard for $80. Pherigo and Owen met Gilyard at a designated location, paid him, and received about two grams of crack. Pherigo kept about half of the crack and gave the remaining portion to Owen.

After his arrest, Owen agreed to lead the police to the source of the controlled substance. The investigation was dormant until March, when Owen received a call from Pherigo, who expressed his concern that Owen might be purchasing his cocaine from someone else. On March 29, 2001, Owen contacted Pherigo–under the direction of the police–and agreed to buy two ounces of crack from Pherigo. It was agreed that Pherigo would first acquire the crack from Gilyard and then deliver it to Owen later in the day at a Mobil Mart gas station.

En route to the Mobil station, at approximately 4:30 p.m., according to Owen's testimony, he engaged in a three-way cell-phone call with Pherigo and Gilyard. During the conversation Gilyard sought an assurance that "it was a real deal and not just to mess him up . . . he didn't want to have it available and get it ready if it wasn't

---

[2] The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

going to happen." According to phone records, Gilyard placed a second call to Owen around 5:00 p.m. Shortly thereafter, Pherigo arrived–in a vehicle driven by Piercefield–at the designated drop site. After Pherigo transferred the cocaine to Owen, Pherigo and Piercefield were arrested, and the police seized Pherigo's pager. Meanwhile, Owen placed a call to Gilyard–at the request of the police–stating that the amount of crack delivered to Pherigo was "short." Gilyard denied to Owen that he had provided Pherigo the lesser amount and stated that he would attempt to reach Pherigo. Moments after Gilyard's statement, Pherigo's pager–which was on a table at the police station–rang showing Gilyard's number. Other calls followed, and on April 11, 2001, Gilyard was arrested.

## II.
### Pretrial Issues
#### A. *Motion to Sever*

First, Piercefield argues that his case should have been severed from Gilyard's case. He argues that the court erred in its determination that he would not suffer undue prejudice by trial with his codefendants, noting that he–unlike Gilyard and Pherigo–had no record of convictions or even charges; that he was not acquainted with Gilyard; and that "a good portion of the evidence" involved only Gilyard and Pherigo–including beepers, telephone log books, apartment keys, utility bills, pictures of crack cocaine, physical evidence of crack cocaine, torn-up drug notes, weights, scales, safes, cell phones and tape-recorded conversations "that do not even mention William Piercefield." Therefore, Piercefield maintains that "because he was tried with a career drug criminal and a mid-level crack supplier," the jury would not be able to compartmentalize evidence against each defendant. *See United States v. Akers*, 987 F.3d 507, 511 (8th Cir. 1993). However, the district court rejected this argument and denied Piercefield's motion.

A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown. *United States v. Washington*, 318 F.3d 845, 858

(8th Cir. 2003). In a ruling on a motion for severance, a court must weigh the inconvenience and expense of separate trials against the prejudice resulting from a joint trial of codefendants. *United States v. Brim*, 630 F.2d 1307, 1310 (8th Cir. 1980). To grant a motion for severance, the necessary prejudice must be "severe or compelling." *United States v. Warfield*, 97 F.3d 1014, 1018 (8th Cir. 1996). This is because "a joint trial gives the jury the best perspective on all of the evidence and, therefore, increases the likelihood of a correct outcome." *United States v. Darden*, 70 F.3d 1507, 1528 (8th Cir. 1995). In our consideration of the jury's ability to compartmentalize the evidence against the joint defendants, we consider 1) the complexity of the case; 2) if one or more of the defendants were acquitted; and 3) the adequacy of admonitions and instructions by the trial judge. *See United States v. Miller*, 725 F.2d 462, 468 (8th Cir. 1984).

Piercefield concedes that this was neither a complex nor prolonged case. He argues instead that 1) the fact both defendants were found guilty is proof that the jury was unable to compartmentalize the evidence and 2) the trial judge failed to admonish the jury strongly enough. However, both arguments are unavailing. The separate evidence against Piercefield–notably the handwritten confession[3] that he penned–is adequate to explain the jury's guilty verdict. And, not only did the trial judge admonish the jury as evidence was being presented, he also gave an instruction that directed the jury not to consider certain evidence as it related to Piercefield. Hence, because the evidence against the codefendants was properly compartmentalized by

---

[3] In the letter, Piercefield admitted that he drove Pherigo to deliver the "dope" and had full knowledge of what he was doing. In his handwritten confession, he stated: "Steve received a page and asked me if I would give him a ride to meet a buddy. I was to receive some crack for doing this favor. I drove him to a Mobil station by Earth City Expressway where I was soon escorted to the police station. As an average, I might receive approximately $20 to $50 dollars worth of crack for driving or dropping him off somewhere when [sic] drive Steve places [sic] is to deliver or drop off crack."

the jury and the trial court aptly admonished the jury, the motion to sever was properly denied.

## B. Phone Records

Next, Gilyard argues that the district court erred by refusing to exclude records from Verizon Wireless showing service to his cell phone. These records were produced by the Government on August 31, 2001, only four days before trial.[4] Gilyard maintains that had he known that these records would be offered as evidence, he would have performed other investigation that would have directly affected his litigation strategy.[5] The prosecutor explained that the late production[6] was attributable to the Drug Enforcement Agency (DEA), which had misplaced the records. The prosecutor stated that he intended to use the phone records to establish that Gilyard made phone calls to certain numbers and at certain times to support the Government's theory that Gilyard supplied the drugs delivered to Owen on March 29, 2001.

---

[4] The trial began on September 4, 2001, the Tuesday after Labor Day.

[5] At trial Gilyard testified in his own defense. The thrust of his testimony was that while he admitted to being involved in drug-trafficking, he did not participate in the March 29, 2001, transaction and, therefore, was not guilty of the offense charged. Gilyard admitted that he was involved in all of the telephone calls with Pherigo in reference to the two-ounce crack cocaine deal with Owen, and that he had agreed to supply the cocaine. Gilyard also admitted making phone calls to Owen. Further, he recalled calling Pherigo around noon on March 29, and "constantly having a series of conversations with [Pherigo], sort of putting him off." He denied being a party to the alleged three-way conversation, but admitted that on March 29 he called Owen at 5:00 p.m. and a minute later called Piercefield.

[6] A magistrate judge had ordered that all pre-trial disclosure of evidence take place by April 24, 2001. Gilyard requested pre-trial disclosure of evidence by letter dated April 19, 2001.

We review for abuse of discretion the district court's decision whether to exclude evidence to sanction a Government discovery violation. *See United States v. Davis*, 244 F.3d 666, 670 (8th Cir. 2001). In our review we consider (1) whether the Government acted in bad faith and the reason(s) for delay in production; (2) whether there is any prejudice to the defendant; and (3) whether any lesser sanction is appropriate to secure future Government compliance. *United States v. DeCoteau*, 186 F.3d 1008, 1010 (8th Cir. 2001).

In this case, neither party alleges bad faith. All evidence shows that the reason for delay in production of the phone logs was the fact that the records had been misplaced. Therefore, our inquiry must focus on the degree of prejudice Gilyard suffered. *Cf. United States v. Davis*, 244 F.3d 666, 670 (8th Cir. 2001). First, with the exception of the three-way call, Gilyard does not claim surprise in the content of the records. Further, even the three-way call was not a complete surprise. That call was noted in the discovery provided to Gilyard. Furthermore, the late receipt of the phone records in no way prohibited Gilyard from subpoenaing Owen's phone records. Gilyard knew Owen's phone number and could have subpoenaed Owen's phone records at anytime.

Moreover, the alleged prejudice that Gilyard claims to have suffered makes little sense given Gilyard's defense at trial. His defense was that Pherigo, not Owen, procured the drugs from someone else. (Gilyard testified not once but at least five times that Pherigo went behind his back and obtained the drugs from someone else.) So, even if the disputed three-way call had not been made, it does nothing to destroy Gilyard's defense. Finally, Gilyard testified that he called both Owen and Pherigo at 5:00 and 5:01 p.m., about the same time as the three-way call. Thus, because Gilyard suffered no prejudice from the tardy production, the district court's decision is affirmed.

III.

Trial Issues

*A. Batson Challenge*

Gilyard also argues that two black jurors were improperly struck from the jury based upon their race in violation of *Batson v. Kentucky*, 476 U.S. 79, 96 (1986). These two jurors were the only African-American panel members. One juror was employed with United Parcel Service and the other was employed with Western Union. The Government responded to the accusation of discriminatory motive by arguing that the jurors were struck for reasons related to their employment. However, the district court rejected Gilyard's *Batson* challenge.

We review the district court's ruling in a *Batson* challenge for clear error. *United States v. Campbell*, 270 F.3d 702, 760 (8th Cir. 2001). Our inquiry is guided by the well-established three-prong analysis of *Batson.* First, the opponent of the peremptory challenge must establish a prima facie showing that the challenge is discriminatory. *Purkett v. Elem*, 514 U.S. 765, 768 (1995). The proponent of the peremptory challenge must then articulate a race-neutral explanation for the challenge. If a race-neutral explanation is offered, the challenger must show that the explanation is a pretext for discrimination.

The district court determined–by virtue of the fact that all of the potential African-American jurors had been removed by the Government–that Gilyard had established a prima facie case of discrimination.[7] The Government responded that it

---

[7] Although the number of African-Americans struck is relevant to determining whether a defendant has made a prima facie case of discrimination under *Batson*, that evidence alone is insufficient to negate or create such a case. *Luckett v. Kemna*, 203 F.3d 1052, 1053–54 (8th Cir. 2000). However, once the government has proffered a non-discriminatory reason for removal, any deficiency in the defendant's prima facie case is rendered moot. *Devoil-El v. Groose*, 160 F.3d 1184, 1186 (8th Cir. 1998).

struck the jurors based on the nature of their employment, which allegedly afforded them additional insight into the drug industry. *See United States v. Atkins*, 25 F.3d 1401, 1406 (8th Cir. 1994) ("We have consistently allowed the government to use employment status as a valid, race-neutral proxy for juror selection, so long as the government exercises its challenges in a consistent manner.").

Like the district court, we are troubled by the fact that the Government did not ask the jurors about their employment prior to making the questionable strikes. However, we are satisfied with the district court's inquiry as to the Government's reason for striking; it questioned the Government about these strikes and found its responses credible. The "'evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" *United States v. Feemster*, 98 F.3d 1089, 1092 (8th Cir. 1996). We are required to afford the district court a great amount of deference in its pretext determination. Thus, we conclude that the district court correctly observed that employment is a race-neutral ground for the exercise of a peremptory challenge and that the court did not clearly err in finding that the reason stated was not merely pretextual.

### B. Limiting Instruction

Next, Piercefield contends that his trial counsel was ineffective when his counsel failed to request a limiting instruction. This issue, however, is not properly before us. Claims of ineffective assistance of counsel are properly raised in a post-conviction motion under 28 U.S.C. § 2255 and not on direct appeal. *United States v. Evans*, 272 F.3d 1069 (8th Cir. 2001). Accordingly, we will not address the merits of Piercefield's ineffective assistance of counsel claim.

### IV.

### Post-Trial Issues

Piercefield also argues that his trial counsel was ineffective for failing to request a minor or minimal participant reduction under the Sentencing Guidelines. He

argues that there is no legitimate strategic reason why counsel would fail to request a reduction. Acknowledging our preference to not hear ineffective assistance of counsel claims on direct appeal, Piercefield invites us to reconsider our position, noting that there is no reason for him to endure a post-conviction hearing when the same result can be reached by an immediate remand for resentencing.

We decline Piercefield's invitation and state our oft repeated refrain–claims of ineffective assistance of counsel are best evaluated on facts developed outside of the record on direct appeal and are properly raised in a post-conviction motion under 28 U.S.C. § 2255 and not on direct appeal. *Id*; *United States v. Martin*, 274 F.3d 1208 (8th Cir. 2001).

Finally, Pherigo argues that the district court made a sentencing error. We review de novo the application of a sentencing enhancement when it turns on a question of statutory interpretation. *See United States v. Collins*, 321 F.3d 691, 696 (8th Cir. 2003). The district court enhanced Pherigo's sentence based on a prior state-felony conviction. Title 21 U.S.C. § 851 provides that anyone who violates a section of this Title and has previously committed a felony drug offense, must be sentenced to at least ten years in prison. Pherigo argues that the enhancement under § 851 was in error because the state felony was more than ten years old.

However, § 851 is silent as to whether the age of a prior conviction should be considered. The only time constraint addressed in § 851 is the limitation on a defendant's ability to *challenge* a conviction. *See* 21 U.S.C. § 851(e) (precluding challenges to prior convictions "which occurred more than 5 years before the date of the information alleging such prior convictions"). Pherigo argues that because the statute is silent, the rule of lenity should be invoked. However, the rule of lenity is a canon of statutory construction that is used when there is an ambiguity in the wording of the statute. Here, no such ambiguity exists. Thus, his argument is misplaced and without merit.

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.