# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-1043
_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee. | * | |
| | * | |
| v. | * | |
| | * | |
| Cyril J. Bauer, | * | |
| | * | |
| Appellant. | * | |

_____

No. 08-1209
_____

Appeals from the United States
District Court for the
District of Minnesota.

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee. | * | |
| | * | |
| v. | * | |
| | * | |
| Rae Orene Bauer, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  November 11, 2008
Filed:  December 29, 2008

_____

Before WOLLMAN, BEAM, and BENTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

Cyril and Rae Bauer (whom we shall refer to by their first names when appropriate to the context) were charged with twelve counts of bankruptcy fraud and money laundering in violation of 18 U.S.C. §§ 153, 152(1), 152(2), 1956(a)(1)(A)(i), and 1956(c)(7)(D). A jury found them guilty on all counts, and they were sentenced to forty-one months' imprisonment. The Bauers appeal, arguing that the district court[1] erred in admitting certain evidence. Additionally, Cyril contends that the district court erred when it denied his motion for severance and his motion to exclude statements made by Rae. We affirm.

I.

In February 2002, the Bauers filed a joint petition for Chapter 7 bankruptcy in the District of Minnesota, seeking discharge of approximately $121,000 in debt. They submitted schedules listing the value of their home at $80,000 and claimed that the home was encumbered by mortgages totaling $81,000. Because the Bauers had no equity in their home and did not list any other property that was subject to claims by the estate, their bankruptcy was treated as a no asset case. The Bauers' debts were discharged, and the case was closed on June 11, 2002.

Shortly before the case was closed, however, a fire destroyed the Bauers' home, and they submitted an insurance claim that valued the house at $280,000. In the process of settling the insurance claim, the Bauers' insurance company contacted the bankruptcy trustee, Michael Iannacone. Based on the discrepancy between the Bauers' insurance claim and their original valuation of their home, Iannacone successfully moved the bankruptcy court to reopen the case. The Bauers amended their original petition to reflect the equity in their home, and they attempted to switch

---

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

from a federal to a state exemption scheme in order to prevent the equity from becoming property of the estate. Concluding that the Bauers had acted in bad faith when they initially valued their home at $80,000, the bankruptcy court denied the Bauers' request to alter their exemption scheme.

In the process of litigating the exemptions, Iannacone discovered that the Bauers had substantial funds in an Individual Retirement Account (IRA) that they had not disclosed in their initial bankruptcy filings. On March 5, 2003, the Bauers amended their schedules to include information about the IRA, but they maintained that the funds were exempt from the bankruptcy estate. The bankruptcy court disagreed, and it instructed the Bauers to give Iannacone access to both the insurance proceeds and the IRA funds.

Notwithstanding the bankruptcy court's order, the Bauers converted the assets into cash and either spent or hid the money. Beginning on March 5, 2003, Cyril made a series of $10,000 currency withdrawals from the IRA that totaled more than $156,000. On April 24, 2003, the Bauers cashed an insurance check for $244,535. Rae later claimed to have spent her share of the cash, and there is evidence that Cyril's share remains buried on a Wisconsin farm. None of the money was made available to Iannacone or the Bauers' creditors.

As the Bauers' bankruptcy case proceeded in the latter half of 2003, they became openly recalcitrant. In September 2003, Rae began filing a series of defiant affidavits with the bankruptcy court, asserting therein a number of unusual arguments. She declared, for example, that

> Affiant does not and does not intend, to make a use of any and all calendars, including the Gregorian calendar: Bull of Gregory XIII, dated at Tusculum, in the year of the Dominical Incarnation 1582, in the Sixth before the Calends of March, in the Tenth Year of his Pontificate and, Act of Parliament, 24, G.2, c.23, A.D. 1751 and Lord Chesterfield's

letters to his son, February 28 (0.S.0), 1751, March 18 (O.S.), 1751, Location information in item herein is to FORM and is NOT submission to any foreign jurisdiction.

In similar style, Rae denied the existence and jurisdiction of the bankruptcy court, expressed her refusal to turn over her assets, and asserted that the entire bankruptcy proceeding was a mistake. Cyril, who separated from Rae in July 2003, wrote a letter to the bankruptcy judge in October 2003, acknowledging that the court had found him in contempt for refusing to turn over the insurance proceeds and IRA funds.

In February 2007, the Bauers were charged with twelve counts of bankruptcy fraud and money laundering. Before trial, Cyril unsuccessfully moved to sever his case from Rae's. Both parties sought to exclude orders and statements from the bankruptcy court. The government voluntarily agreed not to introduce orders or proceedings in which the bankruptcy judge had held the Bauers in contempt or found that they had acted with dishonest or fraudulent intent. The government was, however, permitted to introduce an audio recording of a hearing held on September 11, 2003, in which the bankruptcy judge warned the Bauers not to abscond with estate assets.

At trial, the central issue was whether the Bauers had acted with intent to defraud the bankruptcy court and their creditors. The Bauers attempted to show that the errors and omissions in their bankruptcy filings were the result of sloppy attorneys and poor legal advice. To contradict this assertion, the government introduced testimony from the lawyers who represented the Bauers in their initial bankruptcy filing. The government also introduced, among other things, the recorded bankruptcy hearing and the statements the Bauers had made in their separate communications with the bankruptcy court.

On appeal, the Bauers argue that the district court erred by admitting statements from the bankruptcy court, and they raise additional issues individually. Cyril asserts

that his severance motion was improperly denied, and he maintains that the government's introduction of Rae's out-of-court statements violated his rights under the Sixth Amendment's Confrontation Clause. Rae argues that testimony from her bankruptcy attorneys violated her attorney-client privilege. She also contends that the evidence was insufficient to sustain her conviction.

## II.

The Bauers take issue with the district court's admission of statements from the bankruptcy court. They focus particularly on the September 11, 2003, hearing, in which the bankruptcy judge warned the Bauers that concealing estate property was a federal felony and that prosecution would result if they acted in contravention of a court order.

We review a district court's admission of evidence for abuse of discretion. United States v. Myers, 503 F.3d 676, 682 (8th Cir. 2007). Relevant evidence is generally admissible, and it should be excluded only if "its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. Evidence is unfairly prejudicial "if it tends to suggest decision on an improper basis." Myers, 503 F.3d at 682 (quoting Wade v. Haynes, 663 F.2d 778, 783 (8th Cir. 1981)).

The statements from the bankruptcy judge were clearly relevant to the prosecution's case. The primary issue for the jury was the Bauers' intent, and the bankruptcy judge's hortatory language was especially probative of the Bauers' state of mind when they failed to follow the court's instructions. The Bauers argue, however, that the admonition of the bankruptcy judge was unfairly prejudicial because it suggested that a judicial officer believed the Bauers had acted wrongfully. We disagree.

The statements in question did not indicate that the Bauers had committed fraud. Rather, they alerted the Bauers to the fact that absconding with estate assets was a violation of federal law—evidence that contradicted the Bauers' assertion that their subsequent behavior was an innocent mistake. As Cyril acknowledges, the government attempted to eliminate any prejudice from the bankruptcy proceedings through redactions and stipulations. The government omitted, for example, a proceeding in which the bankruptcy court found the Bauers in contempt. Moreover, the district court carefully instructed the jury that the bankruptcy was a separate proceeding and should not be confused with the Bauers' criminal trial. In these circumstances, therefore, the district court did not abuse its discretion by admitting the statements from the bankruptcy proceedings.

## III.

Cyril contends that the district court erred when it refused to sever his trial, and that it violated his Confrontation Clause rights by admitting statements made by Rae. Cyril concedes that joinder was proper under Federal Rule of Criminal Procedure 8(b), but he insists that joint trial unfairly prejudiced him. Specifically, he argues that he was harmed by the government's introduction of Rae's defiant affidavits. "A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown." United States v. Noe, 411 F.3d 878, 886 (8th Cir. 2005) (quoting United States v. Pherigo, 327 F.3d 690, 693 (8th Cir. 2003)). Although there is a "strong presumption against severing properly joined cases," severance is necessary if a jury is unable to compartmentalize the evidence against separate defendants. Id.

We conclude that the affidavits did not prejudice Cyril, who himself aptly characterizes the filings as "virtually nonsensical." He nevertheless argues that the affidavits were damaging because they referred to him as Rae's spouse and referred to jointly owned property. But even if the jury took the filings as a serious affront to

-6-

the bankruptcy court, the affidavits did not purport to speak for Cyril. The government elicited testimony from Iannacone that the affidavits were filed solely by Rae, and the jury also heard testimony that the Bauers were separated when the affidavits were filed. To the extent that the affidavits referred to Cyril at all, they provided undisputed information that the jury already knew: namely, that the case involved a joint bankruptcy in which the Bauers had jointly owned property. There is no reason to believe that the jury ascribed the statements in Rae's affidavits to Cyril, or that Cyril suffered prejudice from their admission.

The same analysis applies to Cyril's Confrontation Clause arguments. Citing Bruton v. United States, 391 U.S. 123 (1968), Cyril argues that the affidavits should have been redacted to eliminate any reference to him. Bruton requires redaction when the government introduces an out-of-court statement from one co-defendant that directly accuses or incriminates another. See Gray v. Maryland, 523 U.S. 185, 194 (1998). As the Supreme Court has explained, the prejudicial impact of such statements is so strong that it cannot be cured by a limiting instruction. Id. at 192. The Bruton rule does not come into play here, however, because Rae's statements were not accusatory and they did not incriminate Cyril.[2]

## IV.

Rae argues that her attorneys' testimony violated her attorney-client privilege and that the evidence was insufficient to sustain her conviction.

---

[2]Cyril also argues that admission of the affidavits violated the hearsay rule. This argument fails because the affidavits were not admitted to prove the truth of Rae's assertions, but to prove that she acted intentionally when she provided false information and disregarded orders from the bankruptcy court. See Fed. R. Evid. 801(C).

At trial, the attorneys who assisted the Bauers in their original Chapter 7 filing offered testimony that the Bauers were responsible for the inaccurate information that appeared on their bankruptcy schedules.  Rae argues that this testimony violated her attorney-client privilege.[3]  Whatever privilege Rae may have had,  it is clear that she waived it by choosing to make her attorneys' performance the central element of her defense.  See Baker v. General Motors Corp., 209 F.3d 1051, 1055 (8th Cir. 2000) ("A waiver of the attorney-client privilege may be found where the client places the subject matter of the privileged communication at issue.").

We also reject Rae's assertion that the evidence was insufficient to sustain her conviction.  "We review the sufficiency of the evidence *de novo*, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Hakim, 491 F.3d 843, 845 (8th Cir. 2007) (quotation omitted).  The verdict will be upheld "if there is any interpretation of the evidence that could lead a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt." Id. (quoting United States v. Hamilton, 332 F.3d 1144, 1149 (8th Cir. 2003)).

The evidence against the Bauers was substantial.  To establish that the Bauers knew the true value of their home when they submitted their original bankruptcy schedules, the government produced tax records and testimony from the Bauers' financial planner.  There was also evidence that the Bauers turned down an offer of $150,000 for their house just after they had listed its value at $80,000.  Records from the Bauers' insurance claim further demonstrated that they realized the inaccuracy of

---

[3]As the government points out, it is not certain that the subject matter at issue—information communicated from the Bauers to their attorneys for the purpose of disclosure in publicly filed bankruptcy schedules—was even protected by the privilege.  See United States v. Cote, 456 F.2d 142, 145 n.3 (8th Cir. 1972) (noting that the attorney-client privilege does not "attach to information which the taxpayer intends his attorney to report in the contents of a tax return").

their initial valuation. Similarly, the government introduced evidence that the Bauers were aware of their obligation to disclose information about the money in Cyril's IRA—the most compelling piece of which was Cyril's systematic depletion of the IRA funds after he revealed its existence to the bankruptcy court. The jury was also presented with the Bauers' separate communications to the bankruptcy court, in which they expressly refused to cooperate with court orders. And lastly, the undisputed evidence showed that the Bauers converted the IRA funds and insurance check into cash and spent or buried the more than $400,000 proceeds—all without surrendering anything to the trustee, the court, or their creditors. This evidence was clearly sufficient to support the jury's verdict.

V.

The convictions are affirmed.

_____