# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-2550
_____

United States of America

*Plaintiff - Appellee*

v.

Bandak Wiyual Deng, also known as Jal Wiyual Deng

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Southern District of Iowa - Central
_____

Submitted: March 18, 2025
Filed: July 9, 2025
_____

Before GRUENDER, BENTON, and SHEPHERD, Circuit Judges.
_____

BENTON, Circuit Judge.

The government charged Bandak Wiyual Deng with being a drug user in possession of a firearm. **18 U.S.C. § 922(g)(3)**. After voir dire, he objected to the peremptory strikes of two prospective jurors. The district court[1] upheld the strikes.

_____

[1]The Honorable Stephanie M. Rose, Chief Judge, United States District Court for the Southern District of Iowa.

At trial, Deng tried to introduce parts of his interview with law enforcement. The district court refused to admit them. Deng moved for a judgment of acquittal, arguing that section 922(g)(3) violates the Second Amendment. The district court denied the motion. The jury convicted Deng. He appeals. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

Law enforcement officers suspected Deng of involvement in a shooting at a park on February 10, 2022. Surveillance video showed an individual matching his characteristics exit the driver's side of a car with what appeared to be a gun. The car, a black Ford Taurus, lacked a license plate or paper registration tag. Des Moines Police Detective Danny White searched the area of the shooting, discovering a 9-millimeter round that appeared to be a misfire. At the officers' request, a confidential informant tried to buy a gun from Deng. During the recorded conversation, Deng told the informant that he could not sell the gun then because he needed it for a funeral on February 26. Deng also mentioned a previous shooting, and indicated that he put the wrong bullets in the gun.

On the morning of the funeral, law enforcement officers stopped Deng, who was driving a black Ford Taurus with no license plate or paper registration tag. With his consent, officers searched the car, finding marijuana. They also found a gun under the dashboard—a Smith & Wesson 40-caliber pistol, loaded with three 9-millimeter rounds.

Later that day, after giving Deng *Miranda* warnings, Detective White and FBI Special Agent Ben Carter interviewed him. There, Deng admitted to using drugs since 2012, including marijuana and cocaine in the last few days. During the interview, Detective White had trouble communicating to Deng about where officers found the gun in his car. Going back and forth with Deng, Detective White eventually described the gun's location as "more forward" than the console. Deng acquiesced, saying "All right" multiple times. Deng denied that the gun in the car

-2-

was his.  But he later admitted touching it and test-firing it into a lake.  Deng also said he had only three bullets in the gun.

The government charged Deng with being a drug user in possession of a firearm.  **18 U.S.C. § 922(g)(3)** ("It shall be unlawful for any person who is an unlawful user of or addicted to any controlled substance . . . to . . . possess in or affecting commerce, any firearm or ammunition.").

After voir dire, the government exercised its peremptory strikes against Prospective Jurors 6 and 15.  Deng objected that the strikes violated the Equal Protection Clause.  *See **Batson v. Kentucky***, 476 U.S. 79, 89 (1986).  The district court overruled his objections.

The government introduced into evidence only parts of Deng's interview. Deng moved to admit other parts under the rule of completeness.  *See **Fed. R. Evid.** 106*.  The district court did not admit them.  During trial, Deng offered parts of the interview when cross-examining Detective White.  The district court ruled that they were inadmissible hearsay.  *See **Fed. R. Evid.** 802*.

After the government rested, Deng moved for a judgment of acquittal, arguing that section 922(g)(3) violated the Second Amendment.  The district court denied the motion.

The jury convicted Deng.  He appeals.  This court reviews district court decisions on peremptory strikes for clear error.  ***Moran v. Clarke***, 443 F.3d 646, 651 (8th Cir. 2006).  This court reviews evidentiary rulings for abuse of discretion. ***United States v. Canales***, 857 F.3d 963, 965 (8th Cir. 2017).  This court reviews a denial of a motion for a judgment of acquittal de novo.  ***United States v. Aungie***, 4 F.4th 638, 643 (8th Cir. 2021).

## II.

The Equal Protection Clause prohibits peremptory strikes of prospective jurors "solely on account of their race." *Batson*, 476 U.S. at 89. To determine whether the government impermissibly struck a prospective juror on account of the juror's race, courts use a three-part test. "First, the party objecting to the strike must make a prima facie showing that the strike was racially motivated." *United States v. Maxwell*, 473 F.3d 868, 871 (8th Cir. 2007). "The burden then shifts to the striking party to present a race-neutral explanation for the strike." *Id.* "Once the striking party offers a race-neutral explanation for the strike, the objecting party may come forward with a reason or reasons why the proffered explanation is really a pretext for discrimination." *Id.* The standard the government must meet is "extremely low." *Moran*, 443 F.3d at 652. The ultimate burden to prove that the strikes were motivated by purposeful racial discrimination is always with the party opposing the strike. *Maxwell*, 473 F.3d at 871. On appeal, this court "looks at the same factors as the trial judge, but is necessarily doing so on a paper record." *Flowers v. Miss.*, 588 U.S. 284, 303 (2019). "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Id.*

Deng immigrated to the United States from Ethiopia as a child. Prospective Juror 6 immigrated to the United States from the Dominican Republic. Prospective Juror 15 was an African American man. The government argues that these facts alone do not make a prima facie showing that its strikes were racially motivated. Deng counters that these facts made a prima facie case. He adds that this court has declined to assess the sufficiency of a prima facie case when the district court conducted step two of the *Batson* test. Yes, this court has indicated that failure to make a prima facie showing is moot after the government responds with a race-neutral explanation. *United States v. Hill*, 31 F.4th 1076, 1082 (8th Cir. 2022) (explaining that previous statements by the Supreme Court and this court on this question were "arguably in *dicta*"). However, this court can affirm the district

-4-

court's rulings without addressing this issue. This court thus need not decide whether Deng failed to make a prima facie showing.

A.

Deng objected that the government struck Prospective Juror 6 because of her race and her status as an immigrant. The government responded that it believed that the defense would argue at trial that law enforcement should have used photographs of the gun to better communicate with Deng at his interview. Prospective Juror 6 sometimes communicated at work with employees who did not speak English as a first language. The government expressed concern that "because of her circumstances," Prospective Juror 6 might "start blending" Deng's situation with her experience translating to non-English speakers. After hearing from and questioning Deng's counsel, the district court upheld the government's strike because it was "based on the fact that English is not her first language, that she has unique experience in that area, and it's fair for the Government to strike her based on that concern."

On appeal, Deng highlights that the trial transcript nowhere shows that English was not Prospective Juror 6's first language. But even assuming the district court "erroneously attributed" an argument that the government did not make, the record shows that the district court "properly considered the actual reasons given by the government." *Maxwell*, 473 F.3d at 873 n.3. The district court considered the government's argument that, due to her experience translating to people for whom English was not a first language, Prospective Juror 6 would be sympathetic to Deng's defense that there were miscommunications when law enforcement interviewed him. Before ruling on Deng's objection to the peremptory strike, the district court asked Deng's counsel if he intended to pursue a defense that Deng "does not speak English as his first language and that there may have been translation or misunderstandings because of that." Deng's counsel expected to "criticize law enforcement's effective communication with the defendant." It is a valid race-neutral reason to peremptorily strike a prospective juror because she may, due to her work experiences, sympathize

with an argument. *United States v. Johnson*, 905 F.2d 222, 222 (8th Cir. 1990) (upholding the peremptory strikes of prospective jurors struck "because of their employment with the Division of Family Services, based on the belief they would be sympathetic to Johnson's defense").

On appeal, Deng includes that he never asked Prospective Juror 6 if she used photos to communicate with people. During voir dire, Deng's counsel asked jurors, including Prospective Juror 6, about their experiences working with people who do not speak English as a first language. He asked another juror: "Do you ever use pictures or anything like that to make sure that you're talking about the same thing?" But to Prospective Juror 6, he merely asked about "a strategy" she used to communicate with non-English speakers, and she did not say that she used pictures. However, later, trying to show that the government's race-neutral reason for striking Prospective Juror 6 was pretext, Deng's counsel asserted: "The fact that she uses pictures to communicate with people who speak a different language is not a reason to strike her, especially under these circumstances." Also, Deng never tried to show pretext by arguing that Prospective Juror 6 was "similarly situated" to jurors who the government did not strike. *Elmahdi v. Marriott Hotel Services, Inc.*, 339 F.3d 645, 651–52 (8th Cir. 2003). The ultimate burden is on the opponent of the peremptory strike. On this record, Deng "failed to carry his burden of demonstrating pretext." *Maxwell*, 473 F.3d at 873. The district court did not clearly err in overruling Deng's objection.

B.

Deng objected that the government struck Prospective Juror 15 because of his race. The government offered the race-neutral explanation that Prospective Juror 15 "couldn't remember any details about" a jury case he said that he served on. The government elaborated that it understood "a lot of jurors don't want to be here, but the concern was it just seemed like that is hard to accept that somebody's 40 years old, doesn't have any memory of a prior jury service." Concern that a prospective juror may be uninterested in the case, based on his responses during voir dire, is a

valid race-neutral reason to peremptorily strike him. ***United States v. Davis***, 871 F.2d 71, 72 (8th Cir. 1989) (upholding a peremptory strike justified in part by the government's concern that "venire members who failed to answer questions were not listening or were uninterested in the case"); ***United States v. Warren***, 788 F.3d 805, 813 (8th Cir. 2015) ("Passivity, inattentiveness, and confusion are common race neutral reasons for striking jurors."); ***United States v. Iron Crow***, 970 F.3d 1003, 1007 (8th Cir. 2020) (upholding a peremptory strike of a juror who "appeared 'disinterested' and was 'very hard to engage'").

Responding to the government's explanation, Deng's counsel said that other jurors also could not remember details of their jury cases. The district court upheld the strike, saying that Prospective Juror 15, unlike other jurors, could not tell the court whether the jury case "was criminal or civil, how long ago it was, where it was, or anything else about it."

On appeal, Deng emphasizes that, during voir dire, Prospective Juror 15 *did* tell the court where his prior jury service was—Oskaloosa, Iowa. Prospective Juror 15 also told the court that the jury case was "a while ago, a long time." Deng argues that Prospective Juror 15 was similarly situated to Prospective Juror 20.

One way that Deng can show pretext is to point to "similarly situated" jurors of other races who were not struck. *See* ***Elmahdi***, 339 F.3d at 651–52. Prospective Juror 20, like Prospective Juror 15, told the court that the jury case was "a long time ago" in Black Hawk County, Iowa. Likewise, she could not remember whether it was civil or criminal. But, unlike Prospective Juror 15, Prospective Juror 20 also told the court that the jury case "was settled out of court." "Even fine race-neutral distinctions between [jurors] are a permissible basis for strikes." ***Edwards v. Roper***, 688 F.3d 449, 455 (8th Cir. 2012). The district court highlighted the difference when upholding the strike: "No. 20 . . . said it was many years ago, in Black Hawk County, and the case settled before she had a chance to deliberate." Although the district court misstated part of the government's argument, the record

shows that the district court "properly considered the actual reasons given by the government." *Maxwell*, 473 F.3d at 873 n.3.

The "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *United States v. Pherigo*, 327 F.3d 690, 696 (8th Cir. 2003) (internal quotations omitted). This court affords a district court "a great amount of deference in its pretext determination." *Id.* True, the difference between Prospective Juror 15 and Prospective Juror 20 is fine, but this court has upheld decisions based on similarly fine differences. *See, e.g.*, *Edwards*, 688 F.3d at 454–55 (distinguishing between two jurors who both expressed frustration about experiences of family members with law enforcement); *United States v. Scott*, 26 F.3d 1458, 1466 (8th Cir. 1994) (distinguishing between jurors who said merely that they previously served on a jury, and a juror who added that the jury he served on acquitted a defendant); *Taylor v. Roper*, 577 F.3d 848, 866 (8th Cir. 2009) (distinguishing between a juror who immediately expressed her opposition to the death penalty, and a juror who tentatively expressed his opposition and acknowledged "pros and cons"); *United States v. Morrison*, 594 F.3d 626, 633 (8th Cir. 2010) (upholding a decision because, though other jurors had some of the same qualities as the struck prospective juror, no other one juror had all those qualities); *Martin v. Symmes*, 820 F.3d 1012, 1013 (8th Cir. 2016), *reaffirming* 782 F.3d 939, 948 (8th Cir. 2015) (holding that the opposing party failed to satisfy his burden of showing pretext because he did not identify "one juror who shared each of the qualities that the government cited as a reason for dismissing" the juror) (later vacated on other grounds and remanded by *Martin v. Smith*, 577 U.S. 1187 (2016)).

Here, the government asked "individual follow-up questions in order to explore" how much individual jurors remembered their previous jury cases. *Flowers*, 588 U.S. at 313. This is not a case where the government focused on specific jurors and tried "to find some pretextual reason—any reason" to strike them. *Id.* at 310. On the record here—in light of the "great amount of deference" to a district court's assessment of a prosecutor's credibility—this court holds that the district court "did not clearly err in finding that the reason stated was not merely

pretextual." ***Pherigo***, 327 F.3d at 696. The district court did not clearly err in denying Deng's *Batson* challenge.

## III.

Deng argues that the district court abused its discretion in its evidentiary rulings. He insists that parts of the interview supporting his defense should have been admitted under the rule of completeness. **Fed. R. Evid.** 106. Alternatively, he argues that the parts of the transcript he sought to introduce during cross-examination were not hearsay because they were not statements introduced for the truth of the matter asserted. **Fed R. Evid.** 801. Rather, Deng argues he offered to introduce them during cross-examination to impeach Detective White. *See **Valdez v. Watkins Motor Lines, Inc.***, 758 F.3d 975, 981 (8th Cir. 2014). As another argument, Deng asserts that he offered them for their effect on the listener, Detective White. *See **White Commc'ns, LLC v. Synergies3 Tec Services, LLC***, 4 F.4th 606, 613 (8th Cir. 2021). Deng argues that the district court mistakenly focused on whether the parts of the interview were "self-serving." *See **United States v. Thiel***, 619 F.2d 788, 781 (8th Cir. 1980) (indicating, in dicta, that whether an out-of-court statement is "selfserving" does not factor into whether the statement is hearsay).

This court need not decide whether the rule of completeness applies here, or whether the parts of the interview are hearsay. If the district court erred at all, it was harmless error. This court "will not reverse an erroneous evidentiary ruling if the error was harmless." ***United States v. Love***, 521 F.3d 1007, 1009 (8th Cir. 2008).

An error is harmless if "no substantial rights of the defendant were affected and . . . the error did not influence or had only a very slight influence on the verdict." ***United States v. Eagle***, 498 F.3d 885, 888 (8th Cir. 2007). Deng argues his substantial rights were affected because the unadmitted parts of the interview were central to his argument. Deng claims that although he may have possessed a gun, the government could not prove he knowingly possessed the Smith & Wesson

hidden in the car.  *See* **18 U.S.C. § 924(a)(8)** (punishing only those who "knowingly" violate section 922(g)).

However, refusing to admit the parts of the interview at most only very slightly influenced the jury's verdict.  At trial, two law enforcement officers, including Detective White, testified about the surveillance footage of the shooting and about the confidential informant's interaction with Deng.  The government played clips of the conversation between the informant and Deng, including where Deng mentioned loading the wrong ammunition into the gun and needing the gun for a funeral.  Other officers testified about stopping Deng, searching the black Ford Taurus he was driving, and finding marijuana and the Smith & Wesson.  Detective White testified about finding a 9-millimeter round near where the shooting took place.  He testified how the round appeared to be a misfire, and that using a 9-millimeter round in a 40-caliber gun can cause misfiring.  He also testified that the three 9-millimeter rounds found in the Smith & Wesson were the same as the round found near the scene of the shooting.  Deng cross-examined the government's witnesses.

Detective White testified about his interview with Deng.  Detective White testified that Deng said that he had the black Ford Taurus since summer of 2021.  Detective White informed the jury that Deng said he touched "that gun" that officers found in his car.  He added that Deng said he got the gun in the summer of 2021 and had test-fired it into a lake.  According to Detective White, Deng said there were only three bullets in the gun.

Detective White also described the difficulty communicating with Deng about where the gun was found.  Detective White explained:

> [W]e had kind of a back-and-forth conversation about where . . . this gun was found. Trying to explain where it was was kind of difficult at the time. I was telling him that it was, you know, in front of the center

console, underneath the dash, and he would come back with, "Okay. In the center console, where the weed was."

And then I'd say, "No. It's forward than that." And then he would say, "Oh, underneath my front seat."

And I'd have to explain further, "No, it's underneath your center console, forward under the dash. There's a spot there." And he eventually said, "All right."

Deng could have cross-examined Detective White about this confusion. He began to, but truncated that line of questioning after the district court refused to admit parts of the interview. He did ask Detective White: "Did you ever show him a picture of the weapon in question?" Detective White responded, "No, sir."

Detective White also testified that in the interview Deng asked him what type of gun was found in the car. During cross-examination, Deng elicited more details about this confusion, but abandoned this line of questioning after the district court refused to admit parts of the interview. *Cf. United States v. Yarrington*, 634 F.3d 440, 448–49 (8th Cir. 2011) (highlighting that defendant "had already elicited testimony . . . on cross-examination" as one reason error was harmless).

The government's evidence "amply supported" Deng's conviction for possessing a firearm as a drug user. *See United States v. Burch*, 809 F.3d 1041, 1047 (8th Cir. 2016). "The record is replete with other evidence that would allow the jury to conclude that" Deng knowingly possessed the Smith & Wesson gun found in his car. *See United States v. Wilcox*, 50 F.3d 600, 603 (8th Cir. 1995). This court concludes that if any error occurred, it was harmless error.

IV.

Deng facially challenges the constitutionality of 18 U.S.C. § 922(g)(3). In *United States v. Veasley*, 98 F.4th 906, 918 (8th Cir. 2024), this court rejected a facial challenge to section 922(g)(3). Deng asks this court to reconsider its precedent

-11-

after *United States v. Rahimi*, 602 U.S. 680 (2024).  However, since *Rahimi*, this court has rejected facial challenges to section 922(g)(3).  *See, e.g.*, **United States v. Cooper**, 127 F.4th 1092, 1094 n.1 (8th Cir. 2025).  This court affirms the denial of Deng's motion for a judgment of acquittal.

* * * * * * *

The judgment is affirmed.

SHEPHERD, Circuit Judge, dissenting.

I respectfully dissent.  In my view, the district court clearly erred in denying the <u>Batson</u>[2] challenge as to Juror 15 because (1) any issue with Deng's prima facie showing on <u>Batson</u> step one is moot, and (2) the district court made clearly erroneous factual findings when ruling on the Government's race-neutral reason for striking Juror 15, a black juror who was struck by the Government because "he couldn't remember any details" about his prior jury service.  Thus, I would reverse and remand for a new trial.

Because the Government raises the issue, this appeal squarely presents the question of whether a failure to make a prima facie showing under <u>Batson</u> becomes moot after the Government responds with a race-neutral explanation for the strike.  Like the majority acknowledges, "this [C]ourt has indicated" that the answer to this question is yes.  <u>See e.g.</u>, <u>ante</u>, at 4; <u>United States v. Young</u>, 129 F.4th 459, 466-67 (8th Cir. 2025) (noting that the defendant did not make a prima-facie showing but declining to affirm on that basis as the failure was "arguably moot"); <u>United States v. Hill</u>, 31 F.4th 1076, 1082 (8th Cir. 2022) (similar); <u>United States v. Walley</u>, 567 F.3d 354, 357 (8th Cir. 2009) (noting that, while it was "doubtful" the defendant made a prima-facie showing, "once the [G]overnment responded with a race-neutral explanation and the district court ruled" on it, "the preliminary *prima facie* issue

---

[2]<u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

became moot"). Thus, I would first conclusively answer the question in the affirmative and adopt a clear rule for litigants in light of our repeated hints.

Since Deng's failure to make a prima-facie showing was moot, I would hold that the district court clearly erred in denying the Batson challenge as to Juror 15. Juror 15, one of only two black potential jurors, was struck by the Government because he could not recall *any* details about his prior jury service. But Juror 20, a white juror, only stated recollection of where her prior jury service occurred; she could not recall what type of case it was, merely stating that "[i]t was settled out of court." When asked follow-up questions about their service, both Juror 15 and Juror 20 said, "I don't remember," and acknowledged that it had been a long time since they served.

I believe the record demonstrates the district court committed clear error. See Walley, 567 F.3d at 357 (reviewing denial of a Batson challenge for clear error). The court specifically stated that it was permissible to strike Juror 15 because he "[could ]not tell [the court] whether [his prior jury service] was criminal or civil, how long ago it was, *where it was*, or anything else about it." This, in the district court's view, distinguished Juror 15 from Juror 20, "who said [her service] was many years ago, in Black Hawk County, and the case settled before she had a chance to deliberate." But Juror 15 specifically knew where his prior service was: "Oskaloosa, Iowa," and so stated. He also, like Juror 20, recalled that his service was "a while ago" without giving a specific date. While this Court has upheld "very fine distinctions between jurors," United States v. Morrison, 594 F.3d 626, 633 (8th Cir. 2010), I know of no instance in which we have ever upheld the denial of a Batson challenge based on a district court's clearly erroneous fact finding that was directly contradicted by the record, see ante at 7. I cannot agree with the majority's conclusion that, after misstating the factual record, "the district court 'properly

considered the actual reasons given by the [G]overnment'" when ruling on the strike.[3]  Ante, at 8 (citation omitted).

As the Supreme Court has reiterated, the similarly situated analysis does not require jurors to be "identical in all respects" for a Batson challenge to have merit because "potential jurors are not products of a set of cookie cutters."  Miller-El v. Dretke, 545 U.S. 231, 247 n.6 (2005).  This Court has also acknowledged that "'similarly situated' for purposes of [a Batson challenge] does not require similarity in all respects."  Smulls v. Roper, 535 F.3d 853, 865 (8th Cir. 2008) (en banc) (citation omitted).  In my view, the "prosecutor's . . . reason for striking a black panelist[, Juror 15,] applie[d] just as well to an otherwise-similar nonblack" panelist, Juror 20.  Miller-El, 545 U.S. at 241.  "[T]hat is evidence tending to prove purposeful discrimination," id., and to hold otherwise would make Batson nothing more "than a dead letter,"  Hill, 31 F.4th at 1088 (Loken, J., concurring).

The district court should have sustained the Batson challenge, and I would reverse and remand for a new trial.  See Avichail ex rel. T.A. v. St. John's Mercy Health Sys., 686 F.3d 548, 552 (8th Cir. 2012) ("A constitutional violation arising from the racially[]motivated exercise of a peremptory strike is a structural defect in a trial that requires automatic reversal.").  Thus, I respectfully dissent.

_____

---

[3]After the district court ruled on the Batson challenge, Juror 20 was ultimately stuck from the panel by the Government.  But this subsequent strike does not cure the clearly erroneous factual findings made at the time of the Batson challenge regarding Juror 15.  Moreover, the Government hinged its argument—both before the district court and this Court—on the merits of its nondiscriminatory reason for striking Juror 15: that Juror 15 was not, *as a matter of fact*, similarly situated to Juror 20.  Because the facts state otherwise, I would reverse.