# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2287

_____

United States of America,

        Appellee,

    v.

Chandra L. Jenkins-Watts,

        Appellant.

_____

No. 08-2291

_____

United States of America,

        Appellee,

    v.

Tarik I. Liwaru,

        Appellant.

_____

No. 08-2295

_____

United States of America,

        Appellee,

Appeals from the United States
District Court for the
Western District of Missouri.

v.                                                  *
                                                    *
Carlton P. Strother,                                *
                                                    *
            Appellant.                              *
                                _____

                        Submitted:  May 13, 2009
                          Filed: August 4, 2009
                                _____

Before WOLLMAN, JOHN R. GIBSON, and MURPHY, Circuit Judges.
                                _____

WOLLMAN, Circuit Judge.

       Carlton Strother, Tarik Liwaru, and Chandra Jenkins-Watts,[1] along with thirteen
co-defendants, were indicted for their involvement in an instant credit fraud scheme
and a loan fraud scheme.  Strother, Liwaru, and Jenkins were tried jointly and
convicted of the charges against them.  Strother and Liwaru were convicted of
conspiracy to commit aggravated identity theft, in violation of 18 U.S.C. §§ 371,
1028A, and 1029; Strother and Jenkins were convicted of conspiracy to commit
identity theft and aggravated identity theft, in violation of 18 U.S.C. §§ 371, 1028,
1028A, and 1029; and Strother was convicted of access device fraud, in violation of
18 U.S.C. § 1029(a)(5).

       The appellants raise a number of issues.  Strother and Liwaru challenge their
sentences and the sufficiency of the evidence to support their convictions.  Liwaru

_____

       [1]Consistent with her appellate briefs, we will refer to Chandra Jenkins-Watts
as Jenkins.

argues that the district court[2] erred in submitting a demonstrative exhibit to the jury and in providing supplemental instructions to the jury's questions. Jenkins contends that her speedy trial rights were violated, that the district court erred in denying her motions to sever and to suppress, that the indictment was defective, and that there was insufficient evidence to convict her of aggravated identity theft. We affirm.

## I. Background

We state the facts in the light most favorable to the jury verdict. United States v. Johnson, 450 F.3d 366, 369 (8th Cir. 2006).

### A. Instant Credit Fraud Scheme

The instant credit fraud scheme in this case involved the use by Strother and his associates of counterfeit Kansas driver's licenses to apply for instant credit, purchasing big-ticket items, and reselling them for about half their retail value. The resale proceeds usually would be split between Strother, who was providing the counterfeit identification, and the associate who utilized the instant credit.

Strother chose identity theft victims based on their credit scores. He received credit reports from coconspirators, including Liwaru, who acquired the reports from legitimate businesses. A victim testified that he had refinanced his mortgage with Hearthside Lending before his identity was stolen, and the parties stipulated that the victims had applied for credit at either Hearthside Lending or an auto dealership before their identities were stolen. Coconspirator Michelle Williams testified that she witnessed Liwaru bring boxes of credit reports to Strother on two or three occasions and that those reports came from a mortgage company called "Heartland Mortgage."

---

[2]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

Strother and his associates would review the credit reports, setting aside the ones with a credit score of around 700. Williams stated that she would look for women with good credit scores who were approximately her age.

Strother supplied the counterfeit Kansas driver's licenses to the coconspirators. To create them, Strother would take a digital photograph of the person assuming the counterfeit identification or one would be given to him. Strother would then leave and return shortly thereafter with a counterfeit Kansas driver's license, complete with the identity theft victim's information, the coconspirator's picture, and, in some cases, the holographic seal of Kansas. Toni Baker, a woman who had been involved in earlier identity theft schemes with Strother, testified that she had observed him making the counterfeit licenses. According to Baker, Strother would go to a friend's house and create the licenses on the computer. Several witnesses attested to the quality of Strother's work. For example, he made several counterfeit licenses for Williams, none of which were detected as fraudulent, even though she used them dozens of times.

The coconspirators, and sometimes Strother himself, would travel to retailers throughout the lower Midwest to open instant credit accounts.[3] After the retailer approved the instant credit, the shopper would spend the entire amount for which she or he was approved. Strother often had buyers lined up to purchase the stolen goods, and he frequently told the shoppers which items to purchase.

In September 2005, a coconspirator was arrested at a Sam's Club in Lenexa, Kansas, after attempting to open an instant credit account. Employees indicated that he had arrived in a blue Crown Victoria, which a responding officer saw leaving the parking lot. The officer stopped the vehicle, and the driver identified himself as

---

[3]Several retailers offer instant credit, a practice that allows consumers to purchase items on credit immediately after their applications are approved.

Liwaru. He said he was coming from a friend's house, but he could not remember the friend's name or address.

Law enforcement officers established video surveillance of Strother's residence in January or February 2006 and tapped Strother's phone in March 2006. In April 2006, Liwaru called Strother to inform him that a coconspirator was arrested in Topeka, Kansas, to which Strother replied that he needed "to clean up house."

## B. Loan Fraud Scheme

In late 2004, Miles Thomas and Maurice Ragland recruited Stephen Edenfield and his girlfriend to join them in a mortgage fraud conspiracy. Thomas testified that he purchased counterfeit driver's licenses in the names of Mr. and Mrs. Doe[4] from Bryant Griffin-Bey, who served as the middleman between Thomas and Strother. Edenfield and his girlfriend then posed as the Does, applying for mortgage loans and appearing at real estate closings. The scheme was successful, and some of the loan proceeds were wired to a fraudulent bank account that Edenfield had opened. In early 2006, Edenfield, Thomas, and Ragland discussed continuing the scheme in Dallas, Texas, but the plan was delayed when Edenfield was arrested in February 2006.

After Edenfield's arrest, Ragland, Thomas, and Ryan Miller revised the conspiracy, deciding to pursue business loans or lines of credit in Dallas. They chose Dallas because Jenkins, Ragland's then-girlfriend, worked there as a business specialist at a bank, handling small business activity such as opening accounts and processing loans. Jenkins could serve as their inside connection and assist them with processing the fraudulent transactions.

---

[4]We will refer to the mortgage fraud identity theft victims as the Does.

Ragland, Miller, Thomas, and Jenkins met at a casino in Kansas City to discuss the scheme. The plan involved acquiring the identity of an individual with a good credit score, finding someone to pose as that individual, purchasing a counterfeit identification card, registering a business, opening an account at the bank where Jenkins worked, and applying for credit and loans for the registered business. Miller announced that they would use the identity of Jane Doe[5] and provided her social security number and birth date to Thomas.

Thomas gave the information to a friend who worked at a mortgage company and asked her to pull Jane Doe's credit report, which she did. The friend gave the report to Thomas, who in turn, gave it to Ragland, who said that he would fax it to Jenkins.

A woman, unnamed at trial, originally agreed to pose as Jane Doe, and Thomas purchased a counterfeit identification from Griffin-Bey. After the unnamed woman withdrew, Miller and Ragland persuaded Sheri Zuber to join the scheme, and Thomas purchased a second identification from Griffin-Bey. Griffin-Bey knew that Thomas had been involved in fraudulent real estate transactions, but Thomas told Griffin-Bey that he was going to use the Jane Doe identification to pass checks, so Griffin-Bey charged him less than usual: $500 for the first license, $250 for the second license. Griffin-Bey brought the women's digital photos to Strother, who created the counterfeit Kansas driver's licenses, charging Griffin-Bey $250-300 for the first license, half that for the second. The Secret Service was monitoring Strother at the time and searching his trash. On March 29, 2006, an agent found photo paper with the images of two Kansas driver's licenses, both displaying the identity information of Jane Doe.

---

[5]We will refer to the loan fraud identity theft victim as Jane Doe.

Miller, Thomas, and Zuber drove overnight to Dallas, arriving on March 24, 2006. They purchased a post office box in Jane Doe's name and registered a business named Brooke Investments. They then drove to the bank where Jenkins worked. Zuber entered the bank alone, armed with Jane Doe's identification and paperwork regarding Brooke Investments. Zuber asked to speak to Jenkins and gave Jenkins the paperwork.

Jenkins submitted four loan applications over the course of fifty minutes. The first was an application for Brooke Investments, a Plano, Texas, construction company listed as having a gross annual revenue of $650,000. Shortly thereafter, Jenkins submitted an application for Brooke Agency, a Shawnee, Kansas, consulting business with a gross annual revenue of $300,000. Jenkins submitted a third loan application under the name Brooke Investments and a fourth under Brooke Agency. The applications requested business loans, lines of credit, and credit cards.

After the bank learned that Jenkins was the subject of a federal criminal investigation, an investigator from the company interviewed her. Jenkins admitted that she suspected the customer identifying herself as Jane Doe was a straw buyer. The investigator searched Jenkins's workspace and found a credit report for Jane Doe, which had been faxed to Jenkins on March 3, 2006. A business specialist would not have had access to credit reports, and the investigator interviewed Jenkins for a second time to ask her about the report. Jenkins said she did not remember receiving the fax and had no explanation for why it was in her workspace. Before terminating the interview, Jenkins told the investigator that she made up the business name Brooke Agency and had altered the dates of establishment of the business in an attempt to get the loans approved.

C. Procedural Background

The government charged sixteen defendants in a thirty-seven count superseding indictment on August 9, 2006. The conduct charged in the indictment included both

-7-

the instant credit and loan fraud schemes. Some of the defendants had not previously been charged, and the district court granted several trial continuances, one of which was requested by the government. The district court denied Jenkins's motions to dismiss, to sever, and to suppress evidence.

Strother, Liwaru, and Jenkins exercised their right to a jury trial, which commenced on October 22, 2007. The government presented substantial evidence of both the instant credit and loan fraud schemes over the course of the five-day trial, including the testimony of several coconspirators, identity theft victims, and law enforcement officials. After the close of the government's evidence and again after the close of all evidence, Liwaru moved for a judgment of acquittal. The district court denied the motions, and the case was submitted to the jury.

During the deliberations, the jury submitted a note requesting Exhibit 29A, a poster board showing Liwaru's photo at the top of the "Hearthside Lending" scheme. There was some discussion about whether the exhibit was demonstrative or whether it had been admitted. The district court referred to its notes and determined that, "it was offered and admitted and unless everyone is in agreement that it was admitted only for demonstrative purposes, with the understanding that it wouldn't be provided to the jury if requested, I'm going to send it back." Exhibit 29A was then delivered to the jury without objection.

The jury sent two notes concerning Liwaru and his connection to Hearthside Lending. The first asked, "[C]an we verify employment of Tarik Liwaru with Hearthside as a fact?" Liwaru's attorney agreed with the district court's response that "there's no evidence that responds to the question," and the jury was instructed "there was no evidence admitted which responds to your question." The second note stated that "there seems to be no specific evidence admitted that Tarik Liwaru was employed at Hearthside however since no one, including Mr. Tarik Liwaru's attorney, disputed the reference to his employment at Hearthside, can we, using our common sense,

-8-

assume that he was, in fact, an employee of Hearthside?" After some discussion, the district court responded, "You must rely on your collective memory of the evidence and the instructions. Beyond that I am unable to respond. You may use your common sense however you should not guess or speculate." None of the defendants objected to this response.

Following the jury's verdicts against Strother, Liwaru, and Jenkins on all of the charges against them, the district court sentenced the defendants and denied Jenkins's motion for dismissal based on the insufficiency of the indictment. This appeal followed.

## II.  Carlton Strother

Strother was convicted of two counts of conspiracy, thirteen counts of aggravated identity theft, and ten counts of access device fraud, in violation of 18 U.S.C. §§ 371, 1028A, and 1029. He was sentenced to 234 months' imprisonment. On appeal, he argues that the evidence was insufficient to support his conviction on the conspiracy count related to the loan fraud scheme and that the district court erred in enhancing his sentence under several sections in the United States Sentencing Guidelines (Guidelines or U.S.S.G.).

### A.  Evidence Was Sufficient To Convict Strother of the Loan Fraud Conspiracy.

Strother contends that the evidence was insufficient to convict him of the loan fraud conspiracy because he did not knowingly form an agreement to commit such fraud. We review the sufficiency of the evidence *de novo*. Johnson, 450 F.3d at 372. "[W]e will affirm if the record, viewed most favorably to the government, contains substantial evidence supporting the jury's verdict, which means evidence sufficient to prove the elements of the crime beyond a reasonable doubt." United States v. Lopez, 443 F.3d 1026, 1030 (8th Cir. 2006) (en banc).

To convict a defendant of conspiracy, the government must prove that there was an agreement to achieve an illegal purpose, that the defendant knew of the agreement, and that the defendant knowingly became part of that agreement. United States v. McAdory, 501 F.3d 868, 871 (8th Cir. 2007). "[A] defendant may be convicted for even a minor role in a conspiracy, so long as the government proves beyond a reasonable doubt that he or she was a member of the conspiracy." Lopez, 443 F.3d at 1030. Moreover, "each member of a conspiracy may be held criminally liable for any substantive crime committed by a co-conspirator in the course and in furtherance of the conspiracy, even though those members did not participate or agree to the specific criminal act." United States v. Hayes, 391 F.3d 958, 962 (8th Cir. 2004) (quoting United States v. Navarrete-Barron, 192 F.3d 786, 792 (8th Cir. 1999)); see also Pinkerton v. United States, 328 U.S. 640, 647 (1946). "A conspiracy may be proved by direct or circumstantial evidence." United States v. Alama, 486 F.3d 1062, 1064 (8th Cir. 2007).

We conclude that the evidence was sufficient to support Strother's conviction. Griffin-Bey testified that he purchased counterfeit licenses from Strother to resell to Thomas, including two in Jane Doe's name. After the first woman backed out of Thomas's plan, Griffin-Bey and Strother agreed to charge Thomas half price for the second license. Although there was no evidence that Strother knew the details of the loan fraud scheme or all of the coconspirators' identities, he was well aware that the counterfeit identifications he produced would be used to engage in illegal financial transactions. Because the government proved each element of conspiracy, we affirm Strother's conviction.

 B.  The Sentence Enhancements Imposed by the District Court Were Appropriate.

We review the district court's interpretation and application of the guidelines *de novo* and its findings of fact for clear error. United States v. Icaza, 492 F.3d 967, 969 (8th Cir. 2007). The district court concluded that Strother's total offense level

was thirty-four and that his criminal history level was two, resulting in a Guidelines sentencing range between 168 and 210 months' imprisonment. After adding a consecutive two-year term of imprisonment for aggravated identity theft, the district court sentenced Strother to 234 months' imprisonment. See 18 U.S.C. § 1028A(a)(1) (mandating a consecutive two-year sentence for aggravated identity theft). Strother argues that the district court erred in imposing the following sentencing enhancements: four levels for role in the offense; fourteen levels for loss in excess of $400,000; four levels for fifty or more victims; two levels for production or trafficking an authentication device; and two levels for use of sophisticated means.

Strother contends that there should have been no adjustment for his role in the offense, arguing that the district court erred in denying him a four-level reduction for his minimal role in the loan fraud scheme that would have negated the four-level enhancement for leadership in the instant credit fraud scheme. We review a district court's denial of a mitigating role reduction for clear error. United States v. Godinez, 474 F.3d 1039, 1042 (8th Cir. 2007). Under U.S.S.G. § 3B1.2(a), a defendant may be eligible for a role reduction if his culpability for the relevant conduct is minimal in comparison to that of other participants, but the mere fact that a defendant is less culpable does not entitle him to the reduction. See id. at 1043 (affirming district court's denial of a two-level minor role reduction); United States v. Johnson, 408 F.3d 535, 538-39 (8th Cir. 2005) (same). The minimal participant reduction "is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 cmt. n.4.

We find no clear error in the district court's denial of Strother's request of a mitigating role reduction. Without the counterfeit identification, the loan fraud scheme could not have been executed. Strother created two counterfeit licenses for women to pose as Jane Doe, and there was no evidence that Thomas had access to counterfeit identification cards beyond those that Strother manufactured. We cannot say that it was clear error to find that Strother was not "plainly among the least culpable" of those involved in the loan fraud scheme. See id.

Strother also contends that the loss attributable to the mortgage fraud scheme was not reasonably foreseeable and thus the district court erred in including that amount in its determination of Strother's amount of loss enhancement. See U.S.S.G. § 2B1.1(b)(1) (amount of loss enhancement). The sentencing court calculates the amount of the loss based on a preponderance of the evidence, and we review the amount of loss determination for clear error. United States v. Boesen, 541 F.3d 838, 850 (8th Cir. 2008). The enhancement for the amount of loss may be based on either the actual or intended loss. U.S.S.G. § 2B1.1 cmt. n.3(A); United States v. Onwumere, 530 F.3d 651, 654 (8th Cir. 2008). Actual loss is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt. n.3(A)(i), and in jointly undertaken criminal activity, a defendant's relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). We are hard pressed to believe that Strother—who was leading a profitable instant credit fraud scheme—could not reasonably foresee that the counterfeit driver's licenses he was manufacturing would be used to obtain fraudulent mortgages. We find no clear error in the application of the fourteen-level amount of loss enhancement.

We also find no clear error in the district court's finding that Strother's illegal conduct involved fifty or more victims. See U.S.S.G. § 2B1.1(b)(2) (number of victims enhancement). Strother argues that the evidence before the district court showed that there were only forty-eight victims. The presentence investigation report (PSR), however, identified four additional victims, who were not counted in Strother's brief and who had their identities stolen by two coconspirators. Moreover, the government's arguments at sentencing included information regarding victims not counted in the PSR, but who had been identified at trial. Because the government presented evidence sufficient to allow the district court to find that Strother's conduct involved fifty or more victims, we conclude that Strother's offense level was properly enhanced by four levels under Guideline § 2B1.1(b)(2)(B).

Strother contends that the district court committed procedural error in applying the Guideline § 2B1.1(b)(10) enhancement. As stated above, Strother was convicted of thirteen counts of aggravated identity theft in violation of 18 U.S.C. § 1028A, which mandates a consecutive two-year term of imprisonment. He argues that § 2B1.6, the guideline concerning aggravated identity theft, disallows the application of the § 2B1.1(b)(10) enhancement in cases in which the defendant has been convicted of under § 1028A.

Guideline § 2B1.1(b)(10) instructs the district court to increase the offense level by two levels if the offense involved:

> (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification.

To avoid double counting of relevant conduct, however, § 2B1.6 limits the application of § 2B1.1(b)(10). Specifically, the commentary instructs that specific offense characteristics for the "transfer, possession, or use of a means of identification" do not apply when the court imposes a sentence for aggravated identity theft. § 2B1.6 cmt. n.2. Under § 1028A(a)(1), a sentence for aggravated identity theft is appropriate for the knowing transfer, possession, or use, without lawful authority, of a means of identification of another person during and in relation to certain felonies. The Guideline's exclusion language tracks the language that triggers the statute's consecutive term of imprisonment, but § 2B1.6 does not exclude all conduct described in § 2B1.1(b)(10).

-13-

A two-level enhancement under § 2B1.1(b)(10) may still apply to a defendant convicted under § 1028A. United States v. Jones, 551 F.3d 19, 25 (1st Cir. 2008); see also United States v. Lyons, 556 F.3d 703, 708-09 (8th Cir. 2009) (leaving open whether the § 2B1.1(b)(10) enhancement applies to a defendant who produced an unauthorized access device and who also was convicted of aggravated identity theft). For example, the production of a counterfeit access device or authentication feature is not conduct encompassed by the prohibition on double counting in the commentary to § 2B1.6. See U.S.S.G. § 2B1.1(b)(10)(B); Jones, 551 F.3d at 25; see also Lyons, 556 F.3d at 708-09. The commentary defines production to include "manufacture, design, alteration, authentication, duplication, or assembly." U.S.S.G. § 2B1.1 cmt. n.9.

Strother qualifies for the § 2B1.1(b)(10) enhancement because he produced counterfeit Kansas driver's licenses with realistic authentication features, conduct that § 2B1.6 does not exclude. We find no procedural error in the district court's application of the Guidelines, and the evidence presented was sufficient to support the § 2B1.1(b)(10) enhancement.

Finally, the district court's finding that Strother employed sophisticated means is not clearly erroneous. See U.S.S.G. § 2B1.1(b)(9)(C) (sophisticated means enhancement). The sophisticated means enhancement applies when the offense involves "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.8(B). "Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." United States v. Bistrup, 449 F.3d 873, 882 (8th Cir. 2006). Strother agues that he committed garden variety identity theft, but the evidence presented showed that Strother engineered an intricate overall instant credit scheme, complete with a vast network of coconspirators to carry out the scheme's numerous steps. Strother obtained credit reports from at least two coconspirators, reviewing the reports for good credit scores. A victim with a good credit score would be matched

-14-

with a coconspirator, and Strother would manufacture high-quality counterfeit Kansas driver's licenses containing the victim's information and the coconspirator's picture. In some instances, Strother had recruited the coconspirator to serve as a shopper in the scheme. At Strother's direction, the coconspirator would open a line of credit at a retail establishment, purchase big-ticket items, and deliver the goods to Strother for resale. Strother and his associates carried out this conduct repeatedly, with minor variations. And to avoid detection, the coconspirators used several different identities and established fraudulent instant credit accounts at several different retailers and retail locations throughout the lower Midwest. We find no clear error in the district court's finding that Strother employed sophisticated means.

## III. Tarik Liwaru

Liwaru was convicted of one count of conspiracy to defraud the United States, in violation of 18 U.S.C. §§ 371, 1028A, and 1029, and was sentenced to five years' imprisonment, the maximum sentence allowed under § 371. He argues that the evidence was insufficient to support his conviction, that the district court improperly submitted Exhibit 29A to the jury and improperly answered the jury's questions, and that the district court erred in enhancing his sentence for amount of loss, number of victims, unauthorized transfer of identification, and sophisticated means.

### A. Evidence Was Sufficient To Convict Liwaru.

Having reviewed the record *de novo*, we conclude that it contains substantial evidence supporting the jury's verdict convicting Liwaru of conspiracy. See Alama, 486 F.3d at 1064; Lopez, 443 F.3d at 1030. Williams testified that Liwaru delivered boxes of credit reports to Strother, and the reports allowed Strother and Williams to identify victims with good credit scores. During trial, the government asked Williams:

Q: Did the Kansas driver's licenses that we have discussed, [naming victims], did at least some of those come out of the boxes of stuff that Tarik brought over?

A: I'm sure almost all of them did.

That Williams identified the source of the credit reports as "Heartland Mortgage" rather than Hearthside Lending is inconsequential, particularly in light of the fact that the named victims in the government's question had submitted credit applications to Hearthside Lending.

We disagree with Liwaru's contention that Williams's testimony is incredible or insubstantial on its face. Credibility challenges are for the jury, and "[t]he test for rejecting evidence as incredible is extraordinarily stringent and is often said to bar reliance only on testimony asserting facts that are physically impossible." United States v. McAtee, 481 F.3d 1099, 1105 (8th Cir. 2007) (quoting United States v. Crenshaw, 359 F.3d 977, 988 (8th Cir. 2004)). Williams gave a thorough account of the instant credit scheme and was subjected to vigorous cross examination. She had personal knowledge of the conspiracy because she was deeply involved with it herself. Nothing in her testimony is incredible or insubstantial on its face.

The government also presented corroborating evidence of Liwaru's involvement in the conspiracy. The evidence suggested that Liwaru drove at least one coconspirator to a retail location to open a fraudulent instant credit account. A law enforcement officer testified that he stopped Liwaru after a coconspirator, who had been the passenger in the car Liwaru was driving, was arrested for attempting to open an instant credit account with a counterfeit Kansas driver's license. The government also presented taped telephone calls between Strother and Liwaru, including one in which Liwaru warns Strother that a coconspirator had been arrested. Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence was sufficient to support Liwaru's conviction.

B. Submission of Exhibit 29A to the Jury During Deliberations Did Not Affect Liwaru's Substantial Rights.

Liwaru contends that Exhibit 29A, a chart showing the interconnection of the instant credit fraud scheme coconspirators, should not have been allowed in the jury room during deliberations because it was a demonstrative exhibit. Liwaru did not object to the chart's submission to the jury during the deliberations, and thus we review the district court's decision for plain error. Fed. R. Crim. P. 52(b). Under plain error review, we reverse only if there has been an error, that is plain, and that affects substantial rights. United States v. Cvijanovich, 556 F.3d 857, 864 (8th Cir. 2009); see also United States v. Olano, 507 U.S. 725, 732-36 (1993). The plain error must have been prejudicial, a requirement that can normally be met only by showing that the error affected the outcome of the case. Cvijanovich, 556 F.3d at 864-65.

Exhibit 29A was not formally offered and admitted into evidence, but the district court incorrectly remembered that it had been and submitted it to the jury without a limiting instruction. See United States v. Possick, 849 F.2d 332, 339 (8th Cir. 1988) ("The submission of purely demonstrative charts to the jury is disfavored, and therefore limiting instructions are more strongly suggested.") (internal citations omitted)). Assuming that such submission was plain error, Liwaru has failed to show that it affected his substantial rights. The jury had seen the chart several times during the government's presentation of its case. Moreover, as stated above, the evidence established that Liwaru brought credit reports from Hearthside Lending to Strother for use in the instant credit fraud scheme. Accordingly, we cannot say that the alleged error affected the outcome of the case.

C. The District Court's Supplemental Instructions Were Not Erroneous.

Liwaru also alleges prejudicial error in the district court's supplemental instructions in response to the jury's questions during deliberations. Specifically, he

contends that the district court's instructions might have prompted the jury to believe that there was extrinsic evidence regarding Liwaru's employment at Hearthside Lending. Liwaru did not object to the district court's responses, and we review them for plain error. See Fed. R. Crim. P. 52(b); United States v. Garcia, 562 F.3d 947, 956 (8th Cir. 2009) (standard of review).

We find no error in the district court's supplemental instructions in response to the jury's questions. "When a jury explicitly requests a supplemental instruction, a trial court must take great care to ensure that any supplemental instructions are accurate, clear, neutral, and non-prejudicial." Garcia, 562 F.3d at 957 (quoting United States v. Morrison, 332 F.3d 530, 532 (8th Cir. 2003)) (internal alterations omitted). The jury requested verification of Liwaru's employment at Hearthside Lending, and the district court replied by saying, "There is no evidence admitted which responds to your question." The jury then asked whether it could assume that he was an employee there, to which the district court instructed the jury to rely on collective memory, use common sense, but "you should not guess or speculate." These supplemental instructions were specific and neutral, accurately responding to the jury's questions. Assuming, as we do, that the jury followed these supplemental instructions, it knew that there was no admitted evidence regarding Liwaru's employment at Hearthside and that it could not speculate as to his employment there.

 D.  The Sentence Enhancements Imposed by the District Court Were Appropriate.

The district court determined that Liwaru's total offense level was twenty-two and his criminal history category was five, resulting in a Guidelines sentencing range of seventy-seven to ninety-six months' imprisonment. The district court held Liwaru responsible for $160,272.90 in losses and more than ten victims, which accounted for the loss and victims related to the Hearthside Lending credit reports. Liwaru argues that the district court erred in enhancing his sentence for amount of loss, number of victims, use of sophisticated means, and unauthorized use of identification.

We find no clear error in the district court's ten-level enhancement of Liwaru's sentence for losses greater than $120,000 and its two-level enhancement for ten or more victims. See U.S.S.G. § 2B1.1(b)(1)-(2) (amount of loss and number of victims enhancements). Liwaru contends that the evidence was insufficient to hold him responsible for the losses attributed to the Hearthside Lending victims, rehashing his argument that there was insufficient evidence to convict him. As set forth above, however, evidence at trial established that Liwaru supplied Strother with the credit reports from Hearthside Lending and was otherwise involved in the instant credit scheme. Those credit reports allowed Strother to create counterfeit identities of victims with good credit scores and perpetuate instant credit fraud. Liwaru also asks us to exclude the loss amounts and victims attributed to unknown coconspirators, but given the time frame, the fact that the victims had submitted their private financial information to Hearthside Lending, and that the fraudulent transactions involved instant credit, the district court could have reasonably concluded that those amounts and victims were attributable to the instant credit scheme and the credit reports that Liwaru provided.[6] The district court properly increased Liwaru's offense level by ten for amount of loss and by two for ten or more victims.

The district court's assessment of a two-level increase for unauthorized use of identifications under Guideline § 2B1.1(b)(10) was similarly appropriate. As stated above, the Guideline provides for a two-level enhancement for the "unauthorized transfer or use of any means of identification unlawfully to produce or maintain any other means of identification." U.S.S.G. § 2B1.1(b)(10)(C)(i). Liwaru's offense conduct, which involved providing credit reports to Strother, fits squarely into this Guideline enhancement, and we find no clear error in the district court's application of it.

_____

[6]Even if we were to exclude the amounts that Williams received from cashing stolen checks, a transaction Liwaru argues is separate from the instant credit scheme, the loss amount would remain more than $120,000, and thus the ten-level enhancement would continue to apply.

-19-

Finally, Liwaru challenges the district court's imposition of the sophisticated means enhancement. Under the advisory guidelines, Liwaru "is responsible under principles of 'relevant conduct' for acts of others that were taken in furtherance of a jointly undertaken criminal activity, if they were reasonably foreseeable by [Liwaru] in connection with the criminal activity." Lyons, 556 F.3d at 707. The evidence tended to show that Liwaru was aware of how the conspiracy worked—from the identification of victims to the creation of the counterfeit driver's licenses to the applications for and use of instant credit. At the very least, the conspiracy's criminal conduct was reasonably foreseeable. Accordingly, the sophisticated means enhancement applies to Liwaru for the same reasons it applied to Strother, and the district court's finding that the conspiracy employed sophisticated means is not clearly erroneous.

## IV. Chandra Jenkins-Watts

Jenkins was convicted of one count of conspiracy to commit identity theft, in violation of 18 U.S.C. §§ 371 and 1028 (a)(7), and four counts of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), and was sentenced to twenty-five months' imprisonment. Jenkins contends that her speedy trial rights were violated, that the indictment was defective, that there was insufficient evidence to convict her, and that the district court erred in denying her motion to sever and her motion to suppress.

### A. Jenkins's Speedy Trial Rights Were Not Violated.

Jenkins argues that her statutory and constitutional speedy trial rights were violated because she was originally indicted on April 19, 2006, and she was not tried until October 22, 2007. We review the district court's factual findings for clear error

-20-

and its legal conclusions *de novo*. United States v. Titlbach, 339 F.3d 692, 699 (8th Cir. 2003).

The trial of a criminal defendant shall commence within seventy days from the filing date of the indictment or from the date of the defendant's appearance, whichever is later. 18 U.S.C. § 3161(c)(1). "[W]hen a newly indicted or arraigned defendant is joined with a defendant whose speedy trial clock has already started running, the latter defendant's speedy trial clock will be reset so that it reflects the speedy trial clock of the newly added codefendant." United States v. Lightfoot, 483 F.3d 876, 885-86 (8th Cir. 2007). Delay caused by pretrial motions is excluded from the calculation of this time frame, as are continuances granted by the court in order to best serve the ends of justice. 18 U.S.C. §§ 3161(h)(1)(F), (h)(8)(A); see also United States v. Shepard, 462 F.3d 847, 863 (8th Cir. 2006).

Jenkins was originally indicted in April 2006. In August, the government filed a superseding indictment that charged sixteen defendants, some of whom had not previously been charged in relation to the instant credit or loan fraud schemes. The defendants made their initial appearances in August and September 2006. Jenkins speedy trial clock was thus reset in early September, when the last of the newly indicted codefendants appeared.

A number of defendants requested continuances throughout the pretrial period, the first of which was filed in September 2006. The district court granted their motions, and trial was set for June 2007. In May 2007, the government moved for a continuance due to the unavailability of a witness, which was granted. In its written orders, the district court explained the reasons that the continuance served the ends of justice. Given the joinder of defendants and pretrial motions in this case, Jenkins's Speedy Trial Act rights were not violated because her speedy trial clock was reset in early September 2006 and the time from the first motion for a continuance to trial is excluded from the speedy trial calculation.

"It would be unusual to find the Sixth Amendment has been violated when the Speedy Trial Act has not." Titlbach, 339 F.3d at 699. "The Sixth Amendment right attaches at the time of arrest or indictment, whichever comes first, and continues until the trial commences." Shepard, 462 F.3d at 864 (quoting United States v. Perez-Perez, 337 F.3d 692, 600 (8th Cir. 2003)) (internal quotations omitted). We consider the following four factors when evaluating a Sixth Amendment claim for pretrial delay: (1) length of delay, (2) reason for the delay, (3) defendant's assertion of her speedy trial right, and (4) prejudice to the defendant. Id. A delay approaching one year may meet the presumption of prejudicial delay and require the application of the other factors. Id.

The eighteen-month delay was the result of justifiable circumstances. As stated above, the trial date was continued because a number of defendants were joined, several defendants asked for continuances, and one of the government's witnesses became temporarily unavailable. Jenkins's assertion that the government caused the delay "for the purpose of getting them to turn on each other" is baseless, and she provides no citation to the record or to any supporting case law. See Jenkins Br. at 31. Although the delay may have caused Jenkins anxiety, she was released on bail during the pendency of her case and allowed to appear via telephone for most pretrial conferences. Most importantly, there is no indication that the passage of time impaired her defense. Thus, although the delay was lengthy and Jenkins repeatedly asserted her right to a speedy trial, Jenkins's constitutional right was not violated.

B.  The District Court Did Not Err in Denying Jenkins's Motion To Sever.

Jenkins argues that she is entitled to a new trial because the indictment improperly joined the defendants and the district court erred in denying her motion to sever.  We review the claim of misjoinder *de novo* and the denial of the motion to sever for abuse of discretion. United States v. Liveoak, 377 F.3d 859, 864 (8th Cir. 2004); see also United States v. Crumley, 528 F.3d 1053, 1062 (8th Cir. 2008) (determining that a defendant need not always move for severance at the end of trial to preserve the issue for appeal).  Reversal is required only if the appellant demonstrates that misjoinder resulted in actual prejudice, i.e., the misjoinder has "a substantial and injurious effect or influence in determining the verdict." Liveoak, 377 F.3d at 865.

Federal Rule of Criminal Procedure 8(b) provides that an indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  All defendants need not be charged in each count, and the prerequisites are liberally construed in favor of joinder.  Liveoak, 377 F.3d at 864. "Once defendants are properly joined under Rule 8, there is a strong presumption for their joint trial." Crumley, 528 F.3d at 1063 (quoting United States v. Flores, 362 F.3d 1030, 1039 (8th Cir. 2004)).

A district court may sever the jointly indicted defendants' trials if joinder appears to prejudice a defendant or the government. Fed. R. Crim. P. 14(a). "To grant a motion for severance, the necessary prejudice must be severe or compelling." Liveoak, 377 F.3d at 864 (quoting United States v. Pherigo, 327 F.3d 690, 693) (8th Cir. 2003)) (internal quotations omitted).  Severance becomes necessary where the proof is such that a jury could not be expected to compartmentalize the evidence as it relates to the separate defendants.  United States v. Bauer, 551 F.3d 786, 791 (8th Cir. 2008).

We conclude that joinder was proper in this case. Count two of the indictment charged Strother, Thomas, Zuber, Edenfield, and Jenkins, along with three other co-defendants, with conspiracy. The indictment described the overarching loan fraud scheme, including the mortgage fraud transactions that took place in Missouri and the attempted fraudulent business loan transactions in Texas. Although Jenkins did not seem to be involved in the Missouri transactions, the plan was to continue the scheme in Texas, where Jenkins worked at a bank and was able to process credit applications. Edenfield's arrest delayed the plan, and the coconspirators reformulated the scheme, recruiting Zuber to pose as Jane Doe and apply for business credit cards, lines of credit, and business loans. Strother fueled both the instant credit scheme and the loan fraud scheme with the counterfeit Kansas driver's licenses.

Even if joinder was improper, Jenkins has shown no actual prejudice. The evidence against Jenkins was substantial and compelling, and the district court carefully instructed the jury:

> Keep in mind that Counts One and Two charge two separate conspiracies and that you must give separate consideration to the evidence about each individual defendant. Each defendant is entitled to be treated separately, and you must return a separate verdict for each defendant. Also keep in mind that you must consider, separately, each crime charged against each individual defendant, and must return a separate verdict for each of those crimes charged.

Jenkins's general assertions of prejudice have failed to demonstrate that joinder had a substantial and injurious effect on the jury's determination of her guilt, and we find no abuse of discretion in the district court's denial of Jenkins's motion to sever.

C. The District Court Did Not Err in Denying Jenkins's Motion to Suppress.

Jenkins argues that the district court erred in denying her motion to suppress the statements she made to bank personnel, whom she contends were acting as government agents, during the bank's internal investigation. Jenkins contends that the statements were elicited in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). We find no clear error in the district court's factual finding that the bank investigators were private citizens, not law enforcement officers, and affirm its legal conclusion that <u>Miranda</u> warnings were thus not required. <u>See</u> <u>United States v.Garlock</u>, 19 F.3d 441, 442-44 (8th Cir. 1994) (holding that the defendant failed to show that the private persons acted as an instrument or agent of the government and thus there could be no <u>Miranda</u> violation).

D. The Indictment Was Sufficient To Charge Jenkins with
Aggravated Identity Theft.

Jenkins moved for dismissal after she was sentenced, contending that the indictment was insufficient because it failed to define the elements of access device fraud, the predicate offense to the aggravated identity theft count. On appeal from the denial of the motion, Jenkins renews her argument and contends that we should review the sufficiency of the indictment *de novo*.

Motions alleging that the indictment fails to invoke the court's jurisdiction or state an offense may be raised at any time while the case is pending. Fed. R. Crim. P. 12(b)(3)(B). When an indictment is challenged for the first time after the verdict is returned, we apply a deferential standard of review, upholding the indictment "unless it is so defective that by no reasonable construction can it be said to charge the offense for which the defendants were convicted." <u>United States v. Redzic</u>, 569 F3d 841, 845 (8th Cir. 2009) (quoting <u>United States v. Pennington</u>, 168 F.3d 1060, 1064-65 (8th Cir. 1996)). An indictment is insufficient if it fails to allege an essential element of

the crime charged. Id. "[I]n determining whether an essential element has been omitted, 'a court may not insist that a particular word or phrase appear in the indictment when the element is alleged "in a form" which substantially states the element.'" Id. (quoting United States v. Mallen, 843 F.3d 1096, 1102 (8th Cir. 1988)).

Section 1028A(a)(1) provides that "[w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." The enumerated felonies include access device fraud, in violation of 18 U.S.C. § 1029(a)(5), which punishes a defendant who "knowingly and with the intent to defraud effects transactions, with 1 or more access devices issued to another person or persons, to receive payment or any other thing of value during any 1-year period the aggregate value of which is equal or greater to $1,000."

Counts thirty-four through thirty-seven of the superseding indictment charged Jenkins with aggravated identity theft and closely tracked the language of § 1028A(a)(1), stating that Jenkins "did knowingly and without lawful authority transfer, use, and possess one or more means of identification of another person, namely XXXX, during and in relation to a predicate felony offense, that being access device fraud as defined by Chapter 47, Title 18, United States Code, Section 1029(a)(5)." The indictment incorporated by reference the offense conduct described in the loan fraud conspiracy count and went on to list the counts, the credit application number, and the bank's credit product. Jenkins complains that the indictment did not refer to § 1029 (a)(5)'s scienter requirement (knowingly and with the intent to defraud) or value amount ($1000 or more).

We conclude that the allegations contained in the indictment were sufficient to charge Jenkins with aggravated identity theft. While it may have been preferable to include the elements of access device fraud, their omission is not fatal. In reviewing

whether the evidence was sufficient to convict a defendant of aggravated identity theft, we have said that the government must prove that the defendant "knowingly used the means of identification of another person without lawful authority during and in relation to an enumerated felony." United States v. Kowal, 527 F.3d 741, 746 (8th Cir. 2008); see also United States v. Hines, 472 F.3d 1038, 1039 (8th Cir. 2007) (per curiam).[7]   The government charged the above-listed elements, identified the enumerated felony it would prove at trial (access device fraud), and cited the statute criminalizing access device fraud (18 U.S.C. § 1029(a)(5)).   Accordingly, the government charged the final element in a form that substantially stated the element. Jenkins has acknowledged as much in her reply brief, "[t]he government attempts, albeit inadequately, [to] define and allege the elements of Section 1029(a) because it knew it had to." Jenkins Reply Br. at 10.

Jenkins's argument that the jury instructions constructively amended the indictment is misplaced.  "A constructive amendment occurs when the essential elements of the offense as charged in the indictment are altered in such a manner—often through the evidence presented at trial or the jury instructions—that the jury is allowed to convict the defendant of an offense different from or in addition to the offenses charged in the indictment." United States v. Starr, 533 F.3d 985, 997 (8th Cir. 2008) (quoting United States v. Whirlwind Soldier, 499 F.3d 862, 870 (8th Cir. 2007)); see also United States v. Buchanan, No. 08-3515, 2009 WL 2213475 at *7 (8th Cir. July 27, 2009) (rejecting appellant's constructive amendment claim). The jury was instructed that the elements of aggravated identity theft were, "*One*, the defendant knowingly used a means of identification of another person; *Two*, the defendant did so without lawful authority; and *Three*, the defendant did so during and

_____

[7]Section 1028A(a)(1) requires the government to show that the defendant knew that the means of identification belonged to another person. Flores-Figueroa v. United States, 129 S. Ct. 1886, 1894 (2009).  Jenkins does not contend that the indictment was insufficient to charge this requirement, nor does she argue that she did not know that the means of identification belonged to another person.

in relation to a criminal offense, namely Access Device Fraud, as described in Instruction Number 45." The jury thus knew that it was required to find that Jenkins committed access device fraud, as defined in the instructions, before it could find that Jenkins committed aggravated identity theft. The jury instructions did not alter or expand the offense charged in the indictment, and the jury convicted Jenkins of the exact offense charged in the indictment.

In her reply brief and at oral argument, Jenkins argued that her conviction of aggravated identity theft cannot stand because the government did not charge her with access device fraud. Without separate counts and convictions of the predicate offense under § 1029(a)(5), Jenkins contends that she cannot be charged or convicted under § 1028A. This issue of first impression should have been raised earlier, and we ordinarily do not address issues raised for the first time in an appellant's reply brief. See United States v. Coplen, 533 F.3d 929, 930 (8th Cir. 2008) (declining to address issues first raised in reply brief). Suffice it to say that the government's decision to charge Jenkins with four counts of aggravated identity theft, and not an additional four counts of access device fraud, did not render the indictment fatally insufficient so as to fail to charge the offense of conviction or deprive the court of jurisdiction. See United States v. Vidal-Reyes, 562 F.3d 43, 55 n.9 (1st Cir. 2009) (assuming without deciding that the government may charge the defendant with violating § 1028A without charging the predicate offense); cf. United States v. Green, 521 F.3d 929, 934 (8th Cir. 2008) (concluding that the government's dismissal of the predicate offense was irrelevant "since a [18 U.S.C.] § 924(c) defendant need not be *convicted* of the underlying crime of violence"); Myers v. United States, 993 F.2d 171, 172 (8th Cir. 1993) (per curiam) (holding that a defendant charged with violating § 924(c) must be proven to have committed the underlying crime, but he need not be separately charged with and convicted of the underlying offense).

### E. The Evidence Was Sufficient To Support Jenkins's Convictions.

Jenkins contends that the government failed to prove the elements of access device fraud to support her conviction of aggravated identity theft. We disagree.

The government proved that Jenkins knowingly and with intent to defraud effected transactions using one or more access device to receive payment of more than $1000. See 18 U.S.C. § 1029(a)(5). Jenkins's intent can be inferred from the evidence adduced at trial. Thomas and Edenfield testified that Jenkins would serve as the inside connection at the bank in Dallas. Her supervisor testified at length about the four applications for credit that Jenkins processed for Brooke Investments and Brooke Agency. Over the course of the four applications, the following information changed: the name of the business, its location, its income, its date of establishment, and the amount of credit requested. The bank investigator testified that Jenkins had said that she made up the name Brooke Agency and that she altered the dates of establishment of the businesses to try to get the loan approved. Based on this evidence, the jury could reasonably find that Jenkins knowingly and with the intent to defraud engaged in access device fraud.

Jenkins argument that she used only counterfeit paper documents, and not an access device, to initiate the transactions is without merit. Access device is defined as

> any card, plate, code, account number . . . or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument).

18 U.S.C. § 1029(e)(1). Jenkins's supervisor testified that Jenkins opened two checking accounts using Jane Doe's personal information and then submitted four

fraudulent applications for business loans and other forms of credit, directing electronic fund transfers to be deposited in the newly opened accounts. The statutory language itself includes account numbers within the definition of access devices, and account numbers are a means of account access, which can be used alone or in conjunction with other access devices to initiate a transfer of funds. See id. The government thus presented sufficient evidence to allow the jury to find that Jenkins effected transactions with one or more access devices.

Finally, Jenkins contends that the government failed to prove that she obtained or received money or things of value over $1000. The statute, however, criminalizes the use of access devices to effect transactions to receive $1000 or more. See 18 U.S.C. § 1029(a)(5). Jenkins submitted four applications for fraudulent loans and lines of credits in excess of $1000, and Jenkins's supervisor discussed each application at length. In light of the evidence presented at trial, the jury could reasonably find that Jenkins committed aggravated identity theft during and in relation to the crime of access device fraud.

Conclusion

We affirm the convictions and sentences.

_____