# United States Court of Appeals
## For the First Circuit

No. 07-2052

UNITED STATES OF AMERICA,

Appellee,

v.

LATANYA JONES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Stahl, Circuit Judges.

Tina Schneider, by Appointment of the Court, for appellant.
Aixa Maldonado-Quiñones, Assistant United States Attorney, with whom Thomas P. Colantuono, United States Attorney, was on brief for appellee.

December 17, 2008

**STAHL, <u>Circuit Judge</u>.** Defendant-Appellant Latanya Jones pled guilty to several charges stemming from her role in a bank fraud conspiracy. On appeal, she contests the sentence imposed on her by the district court, including a two-level increase under U.S.S.G. § 2B1.1(b)(10)(B). Finding no error, we affirm.

## I. Background

### a. The Scheme

Because Jones pled guilty, we recite the facts as delineated in the Government Version of Facts, which accompanied the plea agreement and to which Jones assented. Jones came to the attention of law enforcement when Tameka Lamos, a defendant awaiting sentencing on unrelated charges, informed the Massachusetts State Police and the United States Postal Inspection Service that she was being pressured by her cousin, Latanya Jones, to participate in a bank fraud scheme. Lamos told law enforcement that Jones had at least three co-conspirators, one Bryant Green, with whom she had collaborated for approximately fifteen years, and two New York-based co-conspirators who had the ability to access account records at Bank of America[1] ("the Bank") and to obtain counterfeit drivers' licenses and credit cards.

The Government Version of Facts described the scheme as working in the following manner. The New York co-conspirators

---

[1]Lamos believed that at least one of the New York-based co-conspirators was an employee of Bank of America.

would select an account with a high balance, collect the pertinent customer and account information, and send this information to Jones via express mail.[2]  Also included in the package were a counterfeit driver's license and two credit cards, all bearing the account holder's name.  Jones would then present herself at various bank branches in New Hampshire, Rhode Island, New York, and New Jersey, posing as the account holder, and make withdrawals from the depositor's account.  Co-conspirator Green would accompany her to the branches, monitor her interactions with the tellers, and create a distraction if Jones appeared to be in trouble.  Thereafter, the proceeds of the scheme were divided, with the New York conspirators receiving half and Jones and Green dividing the other half.

Lamos, the informant, told law enforcement that in late December 2006 she accompanied Jones to several Bank of America branches in New Hampshire and Rhode Island, and observed Jones make numerous large cash withdrawals from a targeted account -- the Morrison Account.  A later analysis by the Bank determined that the withdrawals made by Jones from the Morrison Account totaled $42,000, and the government alleges that the Morrison Account had $46,000 in it before Jones began the fraudulent withdrawals.

Jones recruited Lamos into the conspiracy, and trained her to perform the role that Jones had played -- Lamos was to

---

[2]To avoid detection, Jones had the parcels mailed to the house of a friend who was not involved in the scheme.

impersonate the targeted account holder, enter the Bank branches, and attempt to withdraw money from the account using false identification. In order to prepare Lamos for this task, Jones instructed her to have a passport-style photo taken and send it to an address in New York City. The photo would be used to create a driver's license with the information of the targeted account holder, but bearing Lamos' photograph. Lamos did as Jones instructed her. Later, a Postal Inspector intercepted a package from New York containing the forged documents (a driver's license bearing Lamos' photo and two credit cards), as well as information about the new account selected for targeting.

Lamos agreed to wear a wire to a subsequent meeting with Jones and Green, during which the three planned to withdraw large sums of money from the new targeted account -- the Frank Account. A transcript of the meeting shows that Jones and Green spent four hours instructing Lamos on how to conduct the fraud, including how to behave when entering the bank, what cover stories to use to distract the tellers, how much money to request, and which types of tellers to target. The transcript also includes Jones' portion of a telephone call with one of the New York co-conspirators in which she discussed in great detail perceived problems with the counterfeit identifications. Specifically, Jones was agitated to learn that the targeted account holder had moved to a new address, but the fraudulent license sent from New York carried the account

holder's old address. Jones eventually devised a cover story for Lamos to use in order to explain the discrepancy. At one point during the discussion of the problem she also suggested: "Uh, I can fuck around and change the address."

During the planning meeting Jones also lamented that the false driver's license contained air bubbles on the face of the plastic laminate: "Oh, this got water bubbles in it too. We got to poke them out with a pin." Jones requested that Lamos retrieve a safety pin from a drawer in order to pop the air bubbles in the laminate. It is unclear from the transcript who actually popped the bubbles, Lamos or Jones, but it was clearly done at Jones' direction.

Finally, the transcript shows that during the meeting Jones called Bank of America to inquire as to the balance of the Frank Account and the most recent transactions. She determined that the account contained $112,623.96. When the informant, Lamos, asked Jones how much money she should withdraw from the Frank Account at each branch, Jones replied that, on the first day of the scam, Lamos should "stick on fives," meaning withdraw $5000 at each branch she visited. Then, when Lamos asked how many days she would be withdrawing money from the Frank Account, Jones replied, "The bitch got money. This is for us to get rich." Jones also assured Lamos that the large withdrawals of cash from the account would not

raise alarm with the Bank given the recent large expenditures made from the account.

The co-conspirators agreed, according to the transcript, to meet the next morning, February 1, 2006, to begin the scam. Law enforcement arrested the group that day, before any money was withdrawn from the Frank Account.

## b.  The Sentence

Latanya Jones pled guilty to three of the four charges contained in the grand jury indictment:  Count One -- Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. §§ 1344 and 1349; Count Two -- Aiding and Abetting Bank Fraud, in violation of 18 U.S.C. §§ 2, 1344 and 1349; and Count Four -- Aiding and Abetting Aggravated Identity Theft, in violation of 18 U.S.C. §§ 2, 1028A(a)(1)(b) and (c), 1344, and 1349.

At sentencing, as to Counts One and Two, the court calculated a base level offense of seven. In addition, the court applied a ten-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(F), based on an intended loss of greater than $120,000 but less than $200,000. The court added a two-level increase pursuant to U.S.S.G. § 2B1.1(b)(10)(B), because the offense involved production and/or trafficking of a counterfeit access device. A three-level decrease was applied for acceptance of responsibility. This yielded a total offense level of sixteen. Given Jones' criminal history score of thirteen and criminal history category of VI, the

court calculated the advisory guideline sentencing range, as to Counts One and Two, as forty-six to fifty-seven months. As to Count Four, pursuant to U.S.S.G. § 2B1.6, the guideline sentence for a conviction of aggravated identity theft under 18 U.S.C. § 1028A is the term of imprisonment required by statute -- two years, which must run consecutively to any other sentence. Based on these calculations, the district court sentenced Jones to forty-six months imprisonment for Counts One and Two, and twenty-four months imprisonment for Count Four, to be served consecutively, yielding a total prison term of seventy months. The court also imposed a five-year term of supervised release.

### c. On Appeal

On appeal, Jones challenges four aspects of her sentence, but does not contest her underlying conviction. First, she argues that a remand is warranted to consider the sentencing disparity between her and one of her co-conspirators. Second, she challenges the district court's imposition of a ten-level increase based on the amount of loss. Third, she argues that the two-level increase for production or trafficking of a counterfeit access device was not warranted because she was merely an "end user." Fourth, she argues that the district court erred in failing to grant a three-level reduction for inchoate offenses under U.S.S.G. § 2X1.1.

-7-

## II. Discussion

### a. Sentence Disparity

Jones argues that her case should be remanded to the district court for resentencing because her co-conspirator Bryant Green received a total sentence of fifty-one months, while she received a seventy-month term. Jones' claim of sentencing disparity faces two procedural obstacles. First, though Green was sentenced before Jones, she did not raise this objection at sentencing.[3] Therefore, our review on appeal is simply for plain error. United States v. Olano, 507 U.S. 725, 732 (1993). Second, in her plea agreement, Jones waived her right to appeal "the imposition by the Court of a sentence which does not exceed the sentence recommended by the United States." However, we need not determine whether the plea agreement bars Jones from raising the sentencing disparity issue on appeal because it is clear that the

---

[3]Jones suggests that her disparity challenge was preserved below when she made the general argument at sentencing that the sentencing factors set forth in 18 U.S.C. § 3553 warranted a total sentence of no more than fifty-one months. However, as Jones herself admits, at no time in her argument below did she make reference to the specific issue of sentencing disparity. Plainly, then, she has forfeited the argument, and our review can only be for plain error. See United States v. Carrillo-Figueroa, 34 F.3d 33, 39 (1st Cir. 1994) ("Unless the basis for objection is apparent from the context, the grounds for objection must be specific so that the trial court may have an opportunity to address the claim later sought to be presented on appeal.").

district court did not commit plain error in failing to consider this issue in the first instance.[4]

18 U.S.C. § 3553(a) prompts sentencing courts to consider, among other factors, the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." However, we have noted that a "well-founded claim of disparity . . . assumes that apples are being compared to apples," United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005), and that the defendants being compared should be "similarly situated," United States v. Rivera-Maldonado, 194 F.3d 224, 236 (1st Cir. 1999). Here, the court did not plainly err in sentencing Jones to a longer term than Green received because the evidence shows that Jones took the lead relative to Green in many aspects of the scheme: she recruited her cousin Lamos into the scheme, she received the targeted account information and false identifications from the New York co-conspirators via express mail, and she was the face of the fraud as she impersonated the account holders and withdrew money at the Bank branches.

**b. Amount of Loss**

The sentencing court imposed a ten-level increase under U.S.S.G. § 2B1.1(b)(1)(F), based on a finding that the amount of

---

[4]Because we do not consider whether the plea agreement waiver bars appeal of this particular issue, we do not reach Jones' argument concerning Gall v. United States, 128 S.Ct. 586 (2007).

loss was greater than $120,000 but less than $200,000. We review the district court's factual finding as to amount of loss for clear error.[5] United States v. Flores-Seda, 423 F.3d 17, 20 (1st Cir. 2005).

An application note to the relevant guideline clarifies that the term "loss" should be read to mean the "greater of actual loss or intended loss." § 2B1.1, cmt. n.3(A). As this court has previously stated, we will uphold an intended loss determination "where there is good evidence of actual intent and some prospect of success." United States v. Robbio, 186 F.3d 37, 44 (1st Cir.), cert. denied, 528 U.S. 1056 (1999) (quoting United States v. Egemonye, 62 F.3d 425, 428 (1st Cir. 1995)).

The district court reached the loss amount by adding the actual amount withdrawn by Jones from the Morrison Account ($42,000) to the total amount contained in the Frank Account ($112,623.96). In other words, the district court determined that it was reasonable to conclude that Jones intended for Lamos to entirely drain the Frank Account. Jones argues that the record is devoid of "good evidence" supporting her intention that Lamos withdraw the total amount of the funds from the account. We disagree.

---

[5]We note that the parties agree that Jones' plea agreement waiver of appeal does not bar her appeal of the district court's calculation of the guideline range. See United States v. McCoy, 508 F.3d 74, 77-78 (1st Cir. 2007).

On clear error review, we find that there was indeed ample evidence that Jones intended for Lamos to withdraw all of the money contained in the Frank Account and that she had some prospect of success. First, just one month earlier, Jones almost completely drained all funds from the Morrison Account, using the same methods and without detection. Second, Jones showed great interest in the Frank Account's total balance and told Lamos to begin by withdrawing $5000 at each Bank branch she visited. Third, when Lamos asked how many days she would be withdrawing money from the Frank Account, Jones blithely replied, "The bitch got money. This is for us to get rich." There is good evidence that Jones intended for Lamos to drain the Frank Account; Jones' challenge on this ground is without merit.

**c. Production or Trafficking of Counterfeit Access Device**

The sentencing court adopted the Presentence Report recommendation to increase the base offense level by two levels, under U.S.S.G. § 2B1.1(b)(10)(B), which provides, "If the offense involved . . . production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; . . . increase by 2 levels." Jones objected to this increase below, arguing that she was merely an "end user" of the counterfeit identifications, and had no role in producing or trafficking the items. She renews this argument on appeal. Because Jones is raising the legal question of whether the evidence

-11-

was sufficient to support this two-level increase, we review the challenge de novo. United States v. Ramos-Paulino, 488 F.3d 459, 463 (1st Cir. 2007). We review any factual conclusions reached by the district court for clear error. Id.

As a preliminary matter, the sentencing guideline in question provides a two-level increase for "production" or "trafficking." However, it seems clear that the increase could not have been applied to Jones for "trafficking," but only for "production." This is because Jones also pled guilty to Count Four (Aiding and Abetting Aggravated Identity Theft), which carried a statutorily required two-year consecutive sentence, under 18 U.S.C. § 1028A. The guideline commentary associated with that offense, found at U.S.S.G. § 2B1.6, states that "if a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense." U.S.S.G. § 2B1.6, cmt. n.2 (emphasis added). In other words, if a defendant receives the two-year consecutive sentence on the identity theft count, her sentence for any underlying offense is not eligible for a 2-level increase for "transfer, possession, or use" of false identification. Considering the plain meaning of the words, we conclude that Jones' trafficking of a means of identification involved a transfer (though the reverse is not

-12-

necessarily true). Therefore, because of Jones' guilty plea on Count Four, her base offense level can only be increased by two levels under § 2B1.1(b)(10)(B) for "production," but not for "trafficking."

The only question before us, then, is whether the evidence was sufficient to support the conclusion that Jones played a role in the production of the counterfeit identifications. The meaning of "production" in this context is a question of first impression for this circuit; indeed, we believe it is a question that no circuit has had occasion to address directly.

The pertinent guideline offers a useful start by defining "production" to include "manufacture, design, alteration, authentication, duplication, or assembly." U.S.S.G. § 2B1.1, cmt. n.9. Given the facts of this case, the term "alteration" is the only one that may apply to Jones' conduct. The Webster's Third New International Dictionary (1986) defines "alter" as: "to cause to become different in some particular characteristic (as measure, dimension, course, arrangement, or inclination) without changing into something else."

The government points to two pieces of evidence that it argues support the conclusion that Jones engaged in production of the identifications. First, the transcript from the planning session shows that Jones took note of the air bubbles on the face of the fraudulent driver's license and told Green and Lamos that

-13-

the bubbles should be poked out with a pin.  Later, she told Lamos where to look for a straight pin.  Finally, though it is not clear from the transcript who actually popped the bubbles, it is evident that Jones identified the need and the means, and instructed Lamos as to how to remove the bubbles.

The second piece of evidence highlighted by the government is Jones' statement that she could "change the address." It is not clear from the transcript whether she meant that she could send the license back to the New York co-conspirators to have it changed to correspond to the targeted account holder's new address; change the address on the face of the license herself; or change the address on file with the Bank so that it corresponded to the address on the face of the license.  What is clear, however, is that she did not take any of those actions; instead, she devised a cover story for Lamos to use to account for the address discrepancy.

Keeping in mind the definition of "alter" -- to cause to become different in some particular characteristic, without changing into something else -- we believe that the second piece of evidence (Jones' statement that she could change the address) does not constitute alteration.  This is for the simple reason that the guideline refers to alteration and not to the mere capacity to alter.  Here, Jones simply proposed that she <u>could</u> change the

address in some way. Therefore, her statement is not evidence that she produced the license by alteration.

In contrast, we believe that Jones did alter the license by popping, or instructing Lamos to pop, the bubbles on the face of the laminate. Jones recognized that the bubbles could undermine the group's effort to pass the identification off as legitimate; she decided to remove the bubbles in order to bolster the authenticity of the license and the likelihood of success of the conspiracy. Therefore, there is sufficient evidence that, by altering the license, Jones engaged in production of a counterfeit access device. The district court was thus correct to increase her base offense level by two levels, as per § 2B1.1(b)(10)(B). We also note that this two-level increase, which increased Jones' guideline sentence range by about ten months, is not simply a rote or technical application of the guidelines. While the physical act of popping small air bubbles with a straight pin might not seem particularly monumental, it was this act of alteration that transformed the flawed driver's license into a usable counterfeit access device. Such an act is precisely the type of behavior that the guideline attempts to capture under the rubric of "production."

**d. Inchoate Offenses**

Jones' final argument is not presented in great detail in her brief; nor is it persuasive. She suggests that the district court erred by failing to grant a three-level reduction under §

-15-

2X1.1 because Jones was arrested before she completed the withdrawal of any funds from the Frank Account.  Because Jones raises this issue for the first time on appeal, we review only for plain error.  <u>Olano</u>, 507 U.S. at 732.  There is no error here, as the Background to the guideline makes clear:

> In most prosecutions for conspiracies or attempts, the substantive offense was substantially completed or was interrupted or prevented on the verge of completion by the intercession of law enforcement authorities or the victim.  In such cases, no reduction of the offense level is warranted.

U.S.S.G. § 2X1.1 (background).  Such was precisely the case here. At the planning session, the co-conspirators agreed to meet the very next morning to carry out their scheme.  The only reason they did not complete the withdrawal of funds from the Frank Account was that law enforcement arrested them before they could.  As such, Jones was not entitled to a reduction under U.S.S.G. § 2X1.1.

### III. Conclusion

For the foregoing reasons we **<u>affirm</u>** the sentence imposed by the district court.