**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0094n.06

**Nos. 09-5789 and 09-5855**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Feb 10, 2011**
LEONARD GREEN, Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

GREGORY WILEY,

    Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF TENNESSEE

BEFORE: SILER, MOORE, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendant Gregory Wiley appeals his sentences following his guilty plea convictions for three counts of access device fraud and one count of aggravated identity theft in relation to access device fraud. We affirm in part and remand in part.

I.

This case began when Chase Bank informed law enforcement authorities that it was the apparent victim of a large credit card and identity theft ring operating in the Western District of Tennessee. Law enforcement officers investigated the claim, and ultimately arrested Gregory Wiley by following a controlled delivery of a package to his son's address. Wiley subsequently admitted his involvement in the scheme; he also told investigators that his partner-in-crime was Gerald Smith.

Pursuant to their scheme, Smith obtained stolen credit cards, customer identification information, and false driver's licenses. For his part, Wiley completed the false driver's licenses by placing his picture on the cards. Thereafter, Smith and Wiley used the credit cards and false identifications to rent vehicles, make purchases, and obtain cash advances. Wiley shared between 40% and 50% of the proceeds with Smith, and estimated that he personally profited between $10,000 and $15,000 from the scheme.

Wiley was indicted for five counts of access device fraud. He posted bond, but he was later arrested and charged with two additional counts for continuing to commit credit card fraud while he was on bond. Wiley pleaded guilty to Counts One and Five of the original Indictment; and he pleaded guilty to both counts in the subsequent Information for the fraud he committed while on pre-trial release.

The convictions were combined for sentencing. At the sentencing hearing, the district court advised Wiley that, according to the presentence report (PSR), he was responsible for a loss of $195,175.72. The court asked Wiley if he had any questions about the calculations, and Wiley responded that he thought the loss amount stated in the plea agreement was $15,000. The court then allowed Wiley to consult with his attorney.

After a recess, the court informed Wiley that the plea agreement did not say anything regarding the loss amount being $15,000. Wiley was apparently confused between the total loss caused and the profit realized. He also apparently misread the plea agreement because it does not mention the sum of $15,000. The court then asked if Wiley had any other questions, and he replied,

"No." Wiley's counsel also stated: "Your Honor, we don't dispute the calculation of the guidelines . . . I think they are all in agreement of what we were talking about."

The court then adopted the presentence report as its findings of fact for purposes of the hearing. It then sentenced Wiley to 31 months total for both counts in case number 2:07-CR-20221; 10 months on Count One of case number 2:08-CR-20327; and 24 months on Count Two, running consecutively, for a total sentence of 65 months. It also ordered Wiley to pay $15,000 in restitution to victims who were yet to be determined.

Wiley timely appeals.

## II.

Wiley raises five issues on appeal: (1) whether the district court erred by not including a schedule of payments in the judgment, and whether the error voids the restitution portion of the judgment; (2) whether the loss amount used by the district court rendered the sentence procedurally unreasonable; (3) whether the district court properly applied a two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(B)(i) for production of a counterfeit driver's license; (4) whether the district court properly denied him credit for acceptance of responsibility; and (5) whether the written judgments should be amended to conform with the oral sentence of imprisonment and order of $15,000 in restitution. We address these issues, in turn, below.

## A.

Wiley first argues that "[t]he restitution orders of [his] Judgment were erroneous and invalid as they did not state the specific victims Wiley should pay and the amounts each victim should be

paid." We agree. In *United States v. Davis*, 306 F.3d 398 (6th Cir. 2002), we adopted the reasoning of the Fifth Circuit in *United States v. Myers*, 198 F.3d 160, 169 (5th Cir. 1999) and the Third Circuit in *United States v. Coates*, 178 F.3d 681, 683-85 (3d Cir. 1999), holding that a district court's failure to issue a schedule of payments after ordering restitution in one lump sum was plain error. *Id.* at 426. It was therefore plain error for the district court to fail to include a schedule of payments here.

However, Wiley also asserts, without any citation to authority, "given that the restitution order is invalid and erroneous, that portion of the restitution of the judgment should be vacated and stricken . . . . [and] this case remanded to the district court for resentencing with no order of restitution in accordance with the ruling of this Court." There is no basis for such a remedy. Rather, consistent with the remedy ordered in *Davis*, we remand to the district court with instructions to issue a schedule of payments.

B.

Wiley next argues that the district court "miscalculated [his] relevant conduct for sentencing purposes by bringing in additional conduct that was not shown should have been attributed to him . . . [which] render[ed] the sentence procedurally unreasonable." The argument is that because "[he] and Smith would . . . split the proceeds either 50% - 50% or 60% - 40% with Wiley getting the 40% cut" and "[he] profited $10,000 - $15,000 from the fraud," the total amount of loss attributable to him could be no more than $37,500. Wiley also claims that there "appears to be a conflict as to loss attributable to Mr. Wiley . . . . [because] [t]he Presentence Report first states that the losses attributable to Wiley included several tabular calculations amounting to about $195,000 but then

state[s] [that] '[t]he accounts involving Wiley resulted in a loss of approximately $107,035.87,'" and the difference amounts to a two-point change in his base offense level. The government counters that "since [Wiley] did not object and placed on the record there was no objection to the loss calculation, he has expressly admitted the loss and cannot now challenge the loss for the first time on appeal." We agree with the government.

Wiley's first argument fails for two reasons. First, and most fundamentally, Wiley's alleged profits from the scheme have nothing to do with the "actual loss," which is the "reasonably foreseeable pecuniary harm that resulted from the offense," U.S. Sentencing Guidelines Manual § 2B1.1 (2005), cmt. n.3, and therefore does not help his case. Second, as the government stresses, it is well-settled in this circuit that "[b]y failing to object to the presentence report," a defendant "accept[s] all of the factual allegations contained in it." *United States v. Vonner*, 516 F.3d 382, 385-86 (6th Cir. 2008) (en banc); *see also United States v. Stafford*, 258 F.3d 465, 475 (6th Cir. 2001) (explaining that the district court "has no burden to establish at sentencing a factual issue which is not in dispute") (internal quotation marks omitted); *United States v. Pruitt*, 156 F.3d 638, 648 (6th Cir. 1998); *see, e.g., United States v. Adkins*, 429 F.3d 631, 632-33 (6th Cir. 2005) (holding that "by explicitly declining to object to the drug amount attributed to him in the PSR, Adkins admitted that fact"). And that is just what Wiley did here.

The district judge observed at the sentencing hearing that Wiley "started with a level six because the loss is calculated at $195,175.72 . . . . [and] [u]nder Guideline 2B1.1(f) . . . there is a ten point enhancement because the loss is greater than [$]120,000 but less than $200,000." When Wiley

questioned why the amount in the plea agreement "was under 15,000" and the amount in the PSR was "a hundred and ninety five," the court took a brief recess so Wiley could discuss that question with his counsel. Following the break, the district court reiterated: "Mr. Wiley had a question and I've given him the opportunity to discuss the matter with Mr. Perkins. I've also read into the record the plea agreement which did not reference $15,000. But are there any other questions about the report, Mr. Wiley?" Wiley responded: "No, ma'am." The district court then said: "I don't show that there have been any objections filed to the calculations contained in the report. Are there any latent objections?" Wiley's counsel responded, "No, ma'am." In light of this exchange, Wiley's argument that his agreed-upon-profit-splits with Smith show that he could only have been responsible for $37,500.00 fails because he admitted responsibility for the loss of $195,175.72 by failing to object to the PSR.

Wiley's second argument – that there is "a conflict as to loss attributable to Mr. Wiley . . . [because] [t]he Presentence Report first states that the losses attributable to Wiley included several tabular calculations amounting to about $195,000 but then state[s] [that] '[t]he accounts involving Wiley resulted in a loss of approximately $107,035.87'" – is frivolous. The PSR provides that "[t]he loss attributable to Wiley includes, but is not limited to [everything contained in a four-page chart]." The chart lists each of the credit card companies defrauded in the scheme, the individual cardholders' identities, and the individual loss for each card, including $43,985.82 for Chase cards, $107,035.87 for Discover cards, and $44,154.03 for Citigroup-Sears cards, for a total of $195,175.72. The fact that the summary paragraph under the Discover card losses portion of the chart also redundantly

states that Wiley is responsible for all of the Discover card losses shown in the chart (which totaled $107,035.87), does not create any ambiguity that Wiley was also responsible for the $195,175.72 total of all four cards as expressly stated at the beginning of that same section of the PSR. Therefore, we reject Wiley's claim that the district court's finding of a $195,175.72 loss is procedurally unreasonable.

C.

Next, Wiley challenges the district court's application of U.S.S.G. § 2B1.1(b)(10)(B)(i) for conduct "involv[ing] the production or trafficking of any unauthorized access device or counterfeit access device" to increase his base offense level by two points. Because this claim was not raised in the district court in response to the court's *Bostic* question, we review it for plain error. *See Vonner*, 516 F.3d at 385-89 (applying the *United States v. Bostic*, 371 F.3d 865 (6th Cir. 2004) forfeiture rule to procedural-reasonableness claims). When reviewing a claim under a plain error standard, we reverse only if we conclude that "(1) there is an error; (2) that is plain; (3) which affected the defendant's substantial rights; and (4) that seriously affected the fairness, integrity or public reputation of the judicial proceedings." *United States v. Barnes*, 278 F.3d 644, 646 (6th Cir. 2002). Wiley contends that he was over-penalized either because courts are not to "apply any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense" when also imposing a sentence for aggravated identity theft, U.S.S.G. § 2B1.6, cmt. n.2 (def. br., p.36 (quoting *United States v. Lyons*, 556 F.3d

- 7 -

703 (8th Cir. 2009)), or because the production and trafficking in this case were done solely by

Gerald Smith. Neither of these arguments is convincing.

The problem with Wiley's first argument is that, unlike *Lyons*, this is not a "trafficking" case,

but a "production" case. As the First and Eighth Circuits held in *United States v. Jones*, 551 F.3d

19, 25-26 (1st Cir. 2008) and *United States v. Jenkins-Watts*, 574 F.3d. 950, 962 (8th Cir. 2009),

respectively, U.S.S.G. § 2B1.6 commentary note two does not apply when the evidence shows that

the defendant *produced* the false identification. *See Jones*, 551 F.3d at 25-26 (rejecting the argument

where the defendant made counterfeit driver's licenses usable by fixing bubbles in the licenses'

plastic laminate); *Jenkins-Watts*, 574 F.3d 950, 962 (rejecting the argument where the defendant

created counterfeit driver's licenses as part of a fraudulent credit card scheme). This is because the

note does not say anything regarding the "production" of a "means of identity," but is expressly

limited to offenses involving the "transfer, possession, or use of a means of identification," because

it is that conduct that would risk double-counting where a defendant is also convicted of Aggravated

Identity Theft, 18 U.S.C. § 1028A(a)(1). Wiley's citations to *United States v. Tatum*, 518 F.3d 769

(10th Cir. 2008) and *United States v. Hughey*, 147 F.3d 423, 434 (5th Cir. 1998) are not to the

contrary, because those cases, dealing with the passing of bad checks, were based on the

parenthetical exclusion "other than a transfer originated solely by paper instrument" which does not

apply here. *See* 18 U.S.C. § 1029(e)(1).

Wiley's second argument also fails because he engaged in the production of counterfeit

access devices as part of the fraudulent credit card scheme that he participated in with Gerald Smith.

The Guidelines' commentary defines "production" to include "manufacture, design, alteration, authentication, duplication, or assembly[,]" U.S.S.G. § 2B1.1 cmt. n.9, and it defines an "access device" as "any card . . . that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value . . . . [,]" 18 U.S.C. § 1029(e)(1). In this case, Wiley received blank driver's license cards from Smith, produced photographs of himself, and assembled the false licenses by attaching his photographs to the cards. We hold that this conduct is "precisely the type of behavior that the guideline attempts to capture under the rubric of 'production.'" *Jones*, 551 F.3d at 26. Accordingly, we conclude that the district court did not plainly err in increasing Wiley's base offense level pursuant to U.S.S.G. § 2B1.1(b)(10)(B)(i).

D.

Wiley also argues that "[a]lthough he pled guilty and admitted his misconduct to both cases from his original Indictment and a later Information," he was wrongly "denied credit for acceptance due to his re-offending during the pre-trial release on his first Indictment." We review a district court's determination regarding acceptance of responsibility with "great deference" and will not disturb such a decision unless it is "clearly erroneous." *United States v. Webb*, 335 F.3d 534, 538 (6th Cir. 2003) (citations and internal quotation marks omitted). A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right; he must demonstrate by a preponderance of the evidence that he deserves the adjustment. *United States v. Roberts*, 243 F.3d 235, 240-41 (6th Cir. 2001). "Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction . . . will constitute

significant evidence of acceptance of responsibility," but that "evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n.3. Where, as here, "multiple counts are combined [for sentencing] . . . . a defendant must accept responsibility for all counts before he is entitled to a reduction in sentence for acceptance of responsibility." *United States v. Chambers*, 195 F.3d 274, 278 (6th Cir. 1999).

In this case, notwithstanding that Wiley pled "guilty to both the indictment and the information . . . and acknowledg[ed] his conduct as summarized by the prosecutor," the district court determined that he was not entitled to credit for acceptance of responsibility. The court explained that Wiley "did not . . . accept[] responsibility because acceptance of responsibility is more than pleading guilty, . . . it is withdrawing from further criminal conduct" and Wiley "still took the initiative to engage in further criminal conduct with full knowledge of the penalties that he was facing for the '07 conduct." This finding was not clearly erroneous. *See* U.S.S.G. § 3E1.1, Application Note 1(a) (listing "voluntary termination or withdrawal from criminal conduct or associations" as a factor to be considered in determining whether a defendant has accepted responsibility for his criminal conduct); *see also United States v. Reed*, 951 F.2d 97, 99-100 (6th Cir. 1991); *United States v. McDonald*, 22 F.3d 139, 141 (7th Cir. 1994) ("a sentencing judge is not prohibited from considering a defendant's conduct, and specifically may consider criminal conduct or associations engaged in while a defendant is free on bond awaiting trial or sentencing"). We therefore reject Wiley's assertion of clear error.

E.

Finally, Wiley argues that "[t]he written judgments should be amended to conform as to the sentence of Imprisonment and of $15,000 restitution." We have held that when there is a discrepancy between an orally imposed sentence and the written judgment, the oral sentence generally controls. *See United States v. Cofield*, 233 F.3d 405, 406-07 (6th Cir. 2000) (noting the "widely-accepted rule" that "if there is a discrepancy between the oral pronouncement of a criminal sentence and the written judgment, the oral sentence generally controls"). "The reason for the primacy of the oral sentence lies in the fact that '[a] defendant is present only when being sentenced from the bench.'" *United States v. Penson*, 526 F.3d 331, 334 (6th Cir. 2008) (alteration in original) (quoting *United States v. Villano*, 816 F.2d 1448, 1452 (10th Cir. 1987)). Of course, "[w]here there is ambiguity [in the oral sentence]," courts may look to the written judgment to "divine the intent of the sentencing judge." *United States v. Schultz*, 855 F.2d 1217, 1225 (6th Cir. 1988). But where an "oral pronouncement of sentence [is] unambiguous . . . . the written judgment is viewed as a clerical mistake which may be corrected by the district court at any time pursuant to Fed. R. Crim. P. 36." *United States v. Johnson*, 24 F. App'x 417, 420 (6th Cir. 2001).

Here, Wiley claims that "[t]he orally ordered restitution in the amount of $15,000 was [wrongly] stated as two [written] judgments of restitution in the amount of $15,000 each, [for] a total of $30,000." We agree. The written judgments provide that "[t]he defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments . . . . [including] Total Restitution [of] $15,000.00"; and, under the heading "RESTITUTION," the judgments each list "$15,000.00, Victims to be determined." Because the judgments refer to "total" restitution, they

might be read as consistent with the oral sentence inasmuch as the $15,000 is a "total" for all four crimes. However, that reading is untenable, as each of the judgments also includes a "total" assessment of "$200," which is not an aggregate amount for all four crimes, but rather the usual $100 "special assessment" for each of the two crimes listed in each of the two judgments, for a grand total of $400. We therefore conclude that the written judgments produce a sentence that is inconsistent with the oral sentence because they suggest that Wiley owes $30,000 in restitution.

Wiley also claims that "[e]ach of the sentences of imprisonment is to run consecutive to the other, so that logically neither sentence can begin as each is initiated by the completion of the other, which is contingent on the other, and so on" which "conflict[s]" with the district court's stated intention to impose a "'gross sentence' of 65 months." We find this argument unpersuasive. The respective judgments provide:

### IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 31 Months as to Counts 1 and 5 to be served concurrently to each other, and consecutively to the sentence imposed in Information 2:08CR20327-01 (10 Months as to Count 1, and 24 Months as to Count 2, consecutive) for a **total term of 65 Months**.

(Case 2:07-cr-20221-BBD, R. 75, p. 3.)

### IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term 10 Months as to Count 1, and 24 Months as to Count 2 to be served consecutively to each other, and consecutively to the sentence imposed in Indictment 2:07CR20221-01 (31 Months as to Counts 1 and 5, concurrent) for a **total term of 65 Months**.

- 12 -

(Case 2:08-cr-20327-BBD, R. 17, p. 3.)

These paragraphs are not inconsistent with the oral sentence. Instead, they state correctly that the 34-month total sentence in case number 2:08-CR-20327-01 is to run consecutively with the 31-month total sentence in case number 2:07-CF-20221-01 for a total of 65 months. Wiley's assertion that "logically neither sentence can begin as each is initiated by the completion of the other, which is contingent on the other" is itself illogical. The fact that the sentences are *consecutive* does not mean that they are *contingent*. There is no condition precedent to the running of either sentence; they simply cannot run at the same time. Accordingly, we reject Wiley's claim that the written terms of imprisonment should be amended to match the oral sentence.

III.

For these reasons, we remand to the district court with instructions to issue a schedule of restitution payments and to correct the clerical errors in the written judgments regarding the total amount of restitution. In all other respects, we affirm the judgments of the district court.